**Timothy A. Solomon**, OSB 072573
  Direct: 971.634.0194
  Email: tsolomon@LLG-LLC.com
**Justin D. Leonard**, OSB 033736
  Direct: 971.634.0192
  Email: jleonard@LLG-LLC.com
**Holly C. Hayman**, OSB 114146
  Direct: 971.634.0193
  Email: hhayman@LLG-LLC.com
**LEONARD LAW GROUP** LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97258
Fax: 971.634.0250

Proposed Counsel for Debtor and Debtor in Possession

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>**4 Him Food Group, LLC**, an Oregon corporation, dba **Cosmos Creations,**<br><br>Debtor. | Case No. 19-62049-tmr11<br><br>**MOTION FOR ORDERS (1) AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS AND OTHER INTERESTS, (2) APPROVING SALE PROCEDURES, (3) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (4) APPROVING PURCHASE AGREEMENT OR SUBSEQUENT OVERBID, (5) SCHEDULING A HEARING TO CONSIDER APPROVAL OF THE SALE, (6) ESTABLISHING THE FORM AND MANNER OF NOTICES RELATED THERETO, AND (7) REQUESTING WAIVER OF THE STAY UNDER BANKRUPTCY RULE 6004(F) AND 6006(D)**<br><br>*EXPEDITED HEARING REQUESTED* |

**MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF**

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97204
www.leonard-law.com

4 Him Food Group, LLC (the "**Debtor**"), hereby moves (the "**Motion**") the Court for the entry of orders: (a) authorizing and scheduling an auction (the "**Auction**") to sell substantially all assets of the Debtor (the "**Purchased Assets**"), free and clear of liens and other interests (the "**Sale**"); (b) establishing reasonable and necessary bidding procedures in connection with the Sale and the Auction (the "**Sale Procedures**"); (c) approving procedures for the assumption and assignment of executory contracts and unexpired leases (the "**Assumption and Assignment Procedures**"); (d) approving the Sale pursuant to (i) that certain Asset Purchase Agreement dated as of August 14, 2019, by and between the Debtor and Juanita's Snacks, LLC ("**Buyer**"), a copy of which, exclusive of the disclosure schedules, is attached hereto as **Exhibit A** (the "**Agreement**") or (ii) a higher and better offer received at the Auction; (e) scheduling a final hearing to consider approval of the Sale (the "**Sale Hearing**"); and (f) waiving the stay under Bankruptcy Rules 6004(f) and 6006(d); and (g) establishing the form and manner of notices related thereto.

In support of this Motion, the Debtor states as follows:

## BACKGROUND

1.      On July 2, 2019 (the "**Petition Date**"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code.

2.      The Debtor is continuing to operate its businesses and property as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

3.      No trustee or examiner has been requested or appointed.

4.      On August 7, 2019, a Committee of Unsecured Creditors was appointed.

5.      Prior to the Petition Date, as it began experiencing serious financial difficulties and struggled to obtain additional financing, the Debtor began speaking with various potential investors and/or acquirers. The Debtor also engaged Armory Securities, LLC ("**Armory**") as financial advisor and placement agent, to explore a potential sale of the business

**MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF**

and/or debt financing transaction. Armory contacted numerous additional potential transaction partners.

6.  Among the parties Cosmos spoke to was Dominguez Family Enterprises, Inc., the owner of the Juanita's Fine Foods Inc. brand in Hood River, Oregon and the parent company of Buyer.

7.  While a number of additional potential purchasers expressed what appeared to be genuine interest in connection with the Debtor's and Armory's prepetition efforts, the only person or entity that ultimately decided to provide a formal proposal to purchase the Debtor's assets was Buyer.

8.  Based on that proposal and after subsequent discussions, the Debtor and Buyer have negotiated the terms for the sale of substantially all of the Debtor's assets and executed the Agreement.

## JURISDICTION

9.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this motion constitutes a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

10.  The statutory predicates for the relief sought by this motion are sections 105, 363, and 365 of the Bankruptcy Code. This motion is also governed by Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014 and LBR 2002-1 and LBF 363. Venue is proper under 28 U.S.C. § 1408.

## RELIEF REQUESTED

11.  By this motion, the Debtor seeks entry of: (i) an order in the form attached hereto as **Exhibit B** (the "**Sale Procedures Order**") that will, among other things, establish rules by which prospective bidders can qualify to participate at the Auction, schedule the date and time of the Auction, establish rules to govern the Auction, schedule the Sale Hearing, approve Buyer's right to receive reimbursement of actual expenses (the "**Expense**

**MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF**

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97204
www.leonard-law.com

**Reimbursement**") from the successful bidder within three days of the entry of the Sale Order in the event there is a successful overbid and Buyer is not the successful purchaser at the Auction, authorize and approve procedures (the "**Assumption and Assignment Procedures**") for the assumption and assignment of executory contracts and unexpired leases designated by the successful bidder at the Auction, and approve notice procedures relating to the Sale; and (ii) an order in the form attached hereto as **Exhibit C** (the "**Sale Order**") approving the Sale to Buyer or, if an Auction is conducted, to the successful bidder at the Auction.

12.     The Debtor further requests that the Court hold an expedited hearing on this Motion for the purposes of considering and acting on the portion of the Motion that seeks entry of the Sale Procedures Order. The Debtor respectfully requests the Court schedule a hearing at its earliest convenience, preferably during the last week of August or first week of September, subject to the Court's availability. The Debtor will file a separate motion for an expedited hearing.

## SUMMARY AND HIGHLIGHTING OF MATERIAL TERMS OF AGREEMENT[1]

13.     The following is a summary of the terms of the sale transaction contemplated by and in connection with the Agreement, including provisions required to be highlighted in accordance with local rules and guidelines:

| | |
|---|---|
| **Purchase Price:** | The "Purchase Price" is (i) cash in the sum of $9,000,000, plus (ii) assumption of Assumed Liabilities (as defined in the Agreement), plus (iii) a credit bid in the amount of Buyer's secured claim against (a) the book value of Seller's usable and non-obsolete Inventory, and (b) the book value of Seller's current accounts receivable for sales of inventory by Seller not more than 60 days prior to the Closing. The amount of the secured claims that form Buyer's credit bid is estimated at approximately $2.0 million. The specific formula for adjustment to the Purchase Price is set forth in Section 2.5(a) of the Agreement. |

---

[1] The description of the Agreement contained in this motion is a summary only and should not be construed as modifying or limiting the terms of the Agreement. In the event of a conflict between the description in this motion and the Agreement, the provisions of the Agreement shall govern. Capitalized terms used but not defined herein have the meaning ascribed to them in the Agreement.

**MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF**

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97204
www.leonard-law.com

The $9,000,000 cash component of the Purchase Price, subject to adjustment as set forth in Sections 2.5 of the Agreement, will be payable in cash at Closing ("**Closing Cash Consideration**").

In addition to the Purchase Price, in connection with the proposed sale transaction Buyer and the Debtor have agreed to enter into a Grant Agreement, pursuant to which a new entity established by the Debtor will be granted a non-assignable, 20% economic interest in Buyer, which economic interest shall be non-voting and subject to the terms and conditions set forth in the Grant Agreement.

**Sale to Insider:**
Buyer is not an insider as defined in Bankruptcy Code § 101(31).

**Agreements with Management; Releases and Insider Benefits:**
Buyer has agreed in principle to enter into an employment with John Strasheim, the CEO of the Debtor. No employment agreement has been negotiated or drafted. Buyer intends to hire most or all of the Debtor's current employees.

Buyer is released from any potential liability in connection with the purchase of the Purchased Assets, other than the Permitted Liens and Assumed Liabilities as defined in Section 1.4 of the Agreement.

**Sale Free and Clear:**
The sale will be free and clear of Liens and Liabilities, each as defined in the Agreement. The parties with such Liens and Liabilities and the nature of those interests are set forth below.

**Assumption and Assignment of Executory Contracts:**
Buyer does not contemplate purchasing or requesting assumption and assignment of contracts of the Debtor. To the extent such contracts are assumed and assigned to Buyer or another successful purchaser, the Debtor will be responsible for paying cure costs.

**Assumed Liabilities:**
Only those Assumed Liabilities expressly listed in Section 2.3 of the Agreement.

**Excluded Liabilities:**
All liabilities other than those expressly identified as Assumed Liabilities in the Agreement.

**Excluded Assets:**
The "Excluded Assets" as defined in Section 2.2 of the Agreement, including the Debtor's corporate records, insurance policies, rights under the Agreement, and Excluded Contracts.

**Closing Conditions:**
The parties' conditions for closing are set forth in Article 8 and 10 of the Agreement. Such conditions include the accuracy of representations and warranties, the absence of any occurrence or circumstance that has or is reasonably likely to have a Material Adverse Effect, as defined in the Agreement, and the entry of the Sale Order by no later than the close of business on October 11, 2019. There is no financing contingency for Buyer's obligation to close the Sale.

**Expense Reimbursement:**
In the event Buyer is not the Successful Bidder and Debtor sells its assets to an alternative buyer, Buyer is seeking expense reimbursements of up to $250,000, for reasonable costs and fees actually incurred by Buyer. See Section 7.5 of the Agreement for specific details about the

**Page 5 of 20 –**  **MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF**

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97204
www.leonard-law.com

Case 19-62049-tmr11    Doc 48    Filed 08/19/19

Expense Reimbursement provisions.

**Liens:** There are eight secured creditors, as follows: (1) Columbia State Bank; (2) Lane County; (3) 2Loris, LLC; (4) Celtic Capital Corporation; (5) Dominguez Family Enterprises, Inc.; (6) OnDeck Capital; (7) American Pop Corn Company, and (8) Juanita's Snacks, LLC (collectively, the "**Secured Creditors**"). The estimated total of amounts owed on the liens is $11,400,000 (including amounts that will be assumed by Buyer and potentially avoidable liens). The sale is permitted pursuant to § 363(f)(2), as the Secured Creditors are expected to consent to the sale, as well as § 363(f)(1), (3), and (4).

**Good Faith Deposit:** Buyer has not paid a deposit, as it is the holder of secured debts payable by the Debtor in the approximate amount of $2,000,000. As set forth in the Sale Procedures attached as Exhibit 1 to the Sale Procedures Order, all competing bidders will be required to pay a good faith deposit.

**Interim Agreements With Proposed Buyer:** None.

**Use of Proceeds:** Debtor intends to request an interim distribution to the Secured Creditors via separate motion. Debtor will provide for the disbursement of remaining proceeds from the Sale to unsecured creditors pursuant to a proposed Plan to be filed with the Court.

**Record Retention:** After the sale, Debtor will have reasonable access to the books and records as necessary to administer the Chapter 11 case and file final returns, as appropriate.

**Sale of Avoidance Actions:** The sale does not include the sale of any avoidance claims under Chapter 5 of the Bankruptcy Code.

**Requested Findings as to Successor Liability:** Buyer seeks an order that it not be deemed, as a result of any action taken in connection with the Agreement, to (i) be the successor of Debtor, (ii) have, *de facto* or otherwise, merged with or into Debtor, (iii) be a consolidation, mere continuation or substantial continuation of Debtor or the enterprise of Debtor, (iv) be a continuation of the Debtor or the estate's business or (v) be responsible for any liability of Debtor or for payment of any benefit accruing to Debtor.

**Credit Bidding:** The motion does not seek to limit credit bidding under § 363.

**Standard for Approval:** The motion seeks approval of the proposed sale pursuant to the business judgment standard and best interests of the estate standard.

**Relief from Bankruptcy Rule 6004(h):** This motion requests relief from Bankruptcy Rule 6004(h) to protect the value of the Purchased Assets, and to ensure that the estate will not continue to be depleted by ongoing operations.

**Solicitation Process/Competitive Bidding:** Notice of the proposed sale will be given to all creditors and parties in interest, and other parties as required under Bankruptcy Rule 2002(a) and other applicable rules. The sale to Buyer shall be subject to higher and better bids.

**MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF**

## SUMMARY OF THE PROPOSED SALE PROCEDURES

14.     The proposed Sale Procedures are intended to permit a fair and efficient competitive sale consistent with the time line of this Chapter 11 case and promptly identify any alternative bid that is higher or otherwise better than the bid set forth in the Agreement. Because the Sale Procedures (the "**Sale Procedures**" or "**Sale Proc.**") are attached as <u>**Exhibit 1**</u> to proposed Sale Procedures Order, they are not restated herein. Generally speaking, however, the Sale Procedures establish the following, among other things:

(a)     The deadlines and requirements for becoming an Acceptable Bidder, submitting competing bids and the method and criteria by which such competing bids are to become entitled to be Qualified Bids sufficient to trigger an Auction, including the minimum consideration that must be provided and the terms and conditions that must be satisfied by any Bidder (other than Buyer) to be entitled to be an Acceptable Bidder and a Qualified Bidder (Sale Proc. ¶¶ B, D).

(b)     The manner in which Qualified Bids will be evaluated by Debtor to determine the Starting Bid for the Auction (Sale Proc. ¶ E).

(c)     The procedures for conducting the Auction, if any (Sale Proc. ¶ G).

(d)     The criteria by which the "Successful Bidder" will be selected by Debtor (Sale Proc. ¶ H).

(e)     Various other matters relating to the sale process generally, including the Sale Hearing, designation of a Back-Up Bidder, and certain reservations of rights (Sale Proc. ¶¶ I-K).

15.     The Sale Procedures recognize and reflect the Debtor's fiduciary obligations to maximize sale value, and, as such, do not impair the Debtor's ability to consider all qualified bid proposals, and preserve the Debtor's right to modify the Sale Procedures as necessary or appropriate to maximize value for the Debtor's estate in consultation with key parties set forth therein.

16.     The Sale Procedures contain the following provisions that are required to be highlighted pursuant to local rules and guidelines:

**MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF**

(a)     Provisions Governing Qualifications of Bidders. The provisions governing
an entity's right to become an Acceptable Bidder are set forth in
paragraphs B and D of the Sale Procedures. These include the requirement
that Acceptable Bidders must deposit $500,000 in cash, which will be
returned to each party that is not the Successful Bidder.

(b)     Provisions Governing Qualified Bids. The provisions governing Qualified
Bids are set forth in paragraphs D and E of the Sale Procedures. Such
provisions include, among other things, the deadline for submitting a bid,
the requirements for submitting a bid, the assets to be included in the bid,
and the period for which the bid must remain open. Qualified Bids are
required to include a marked-up version of the Agreement, to show
amendments or modifications to the Agreement. Buyer is deemed to have
satisfied all of the bidding conditions.

(c)     Bid Protections to Buyer as Stalking Horse Bidder. The Agreement does
not include any limitations on Debtor's ability to solicit higher or better
bids. Paragraph D(3) of the Sale Procedures sets forth minimum bidding
increments of $100,000, and also sets the Minimum Initial Overbid
Amount. The Minimum Initial Overbid Amount is set at $11,350,000,
which is equal to the $11,000,000 Purchase Price (including $9 million in
cash and $2 million in secured claims), plus the Expense Reimbursement,
plus the $100,000 bidding increment. The Agreement provides that if
Buyer is not, for any reason, the Successful Bidder, Buyer will be entitled
to a cash payment from the Successful Bidder in an amount equal to the
Expense Reimbursement, which shall be in addition to the amount of the
purchase price to be paid by the Successful Bidder. Buyer shall also be
entitled to a return of the Deposit. The Successful Bidder shall pay the
Expense Reimbursement within three days after entry of the Sale Order.
The provisions governing the Expense Reimbursement to Buyer are set
forth in **Exhibit 1** to the Sale Procedures Order.

(d)     Due Diligence Period. Interested parties shall have until _____ __, 2019
(the "**Bid Deadline**") to conduct due diligence. Paragraphs B and C of the
Sale Procedures sets forth the requirements for obtaining due diligence
access.

(e)     Modification of Bidding and Auction Procedures. Paragraph K of the Sale
Procedures describes the Debtor's reservation of the right to modify the
Sale Procedures without further order of the Court.

(f)     Closing with Alternative Backup Bidders. Paragraph J of the Sale
Procedures addresses the ability of Debtor to sell the Purchased Assets to a
Back-Up Bidder.

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97204
www.leonard-law.com

(g) <u>Provisions Governing the Auction</u>. Paragraph G of the Sale Procedures sets forth the provisions governing the auction, and this Motion specifies the date, time and place at which the Auction will be conducted and the method for providing notice to parties of any changes thereto. Further, Paragraph D(1) of the Sale Procedures requires each bidder to identify whether it is bidding for itself or others and if for others, the identities of such parties and whether the bidder is party to any agreement limiting the bidders at the auction.

## PROPOSED ASSUMPTION AND ASSIGNMENT PROCEDURES

17. As set forth above, Buyer <u>does not</u> contemplate assuming any contracts of the Debtor. However, in the event that expectation should change, or if a Successful Bidder other than Buyer purchases the Debtor's assets and desires assumption and assignment of contracts, the following is a summary of proposed Assumption and Assignment Procedures:

(a) The Debtor seeks approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Material Agreements pursuant to the procedures set forth in Schedule 1.2 of the Agreement. Among other things, Debtor will first pay all Cure Costs and timely provide Buyer with the information related to the Material Agreements, as required in the Agreement.

(b) The effective date on which Buyer seeks to have the assumption and assignment of the Material Agreements become effective will be the Closing Date pursuant to the terms of the Agreement (the "**Proposed Assumption Effective Date**").

(c) By the date to be fixed by the Court in the Sale Procedures Order, the Debtor will provide notice (the "**Assumption and Assignment Notice**") to each non-debtor counterparty to a Material Agreement that Buyer designates for assumption and assignment, substantially in the form attached to the Sale Procedures Order as **Exhibit 3**, that (i) identifies the proposed amount to be paid to such counterparty to cure all defaults under such agreement that are required to be cured pursuant to section 365 of the Bankruptcy Code as a prerequisite to assumption (together with the timing of such payments, if any), and (ii) describes the procedures for objecting to the proposed assumption and assignment of the agreement.

(d) Buyer's promise to perform from and after the Closing Date with respect to the Material Agreements shall be the only adequate assurance of future performance provided to satisfy the requirements of section 365 of the Bankruptcy Code.

**MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF**

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97204
www.leonard-law.com

(e)     Objections, if any, to the proposed assumption and assignment of any Material Agreements to Buyer must be made in writing and filed with the Court no later than a date to be fixed by the Court in the Sale Procedures Order (the "**Objection Deadline**").

(f)     Any counterparty to a Material Agreement proposed to be assumed and assigned that does not timely file and serve an objection to assignment (a "**Contract Objection**") before the Objection Deadline will be deemed to have consented to the assumption and assignment of its Material Agreement to Buyer and the cure of existing defaults and shall be forever barred from objecting to the cure and from asserting any additional cure or other amounts against the Debtor or Buyer. In that event, the Debtor and Buyer may provide in the Sale Order for the assumption and assignment of the applicable Material Agreement to Buyer (or other Successful Bidder) and for payment of the cure amount, if any, specified in the Assumption and Assignment Notice, all without further notice to that counterparty.

(g)     If Qualified Alternative Bids are received by the Debtor, and Buyer is not the Successful Bidder at the Auction, the Debtor will provide an amended Assumption and Assignment Notice to each non-Debtor counterparty to an Assumed Contract or Assumed Lease designated by the Successful Bidder for assumption and assignment, identifying the Successful Bidder, and providing information to the non-debtor counterparties regarding the ability of the Successful Bidder to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code. Objections, if any, to the proposed assumption and assignment of any Assumed Contract or Assumed Lease to a Successful Bidder (other than Buyer) must be made in writing and filed with the Court on a date to be fixed by the Court at the Sale Hearing.

(h)     If a timely Contract Objection is filed by the Objection Deadline and such objection cannot otherwise be resolved by the parties, the Bankruptcy Court may hear such objection at the Sale Hearing, or any adjourned date thereof.

(i)     Each Material Agreement will be assumed and assigned to Buyer or the Successful Bidder (as applicable) on the date (the "**Assumption Effective Date**") that is the later of (i) the Proposed Assumption Effective Date, and (ii) the Assumption Resolution Date (as defined below). The "**Assumption Resolution Date**" shall be, (i) if no Contract Objection has been filed on or prior to the Contract Objection Deadline, the business day after the Contract Objection Deadline, or, (ii) if a Contract Objection has been filed on or prior to the Contract Objection Deadline, the date of the Assumption Resolution Stipulation or the date of a Court order authorizing the assumption and assignment to Buyer or the Successful

**MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF**

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97204
www.leonard-law.com

Bidder (as applicable) of the Assumed Contract or Assumed Lease. If Buyer is the Successful Bidder, the Assumption Effective Date shall not be later than the Closing Date.

## POINTS AND AUTHORITIES

A.    Sale of Substantially All Assets Under Section 363

18.    Section 363 of the Bankruptcy Code provides authority for a debtor in possession "after notice and a hearing, [to] use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). This provision generally allows a debtor in possession (subject to court approval) to sell property of the estate outside the ordinary course of business where the proposed sale is a sound exercise of the debtor's business judgment and when the sale is proposed in good faith and for fair value. *See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Ernst Home Ctr., Inc.,* 209 B.R. 974, 980 (Bankr. W.D. Wash. 1997). When a trustee or debtor articulates a reasonable basis for its business decisions, the "court will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

19.    The authority to sell assets conferred upon a debtor in possession by section 363(b) "include[s] a sale of substantially all the assets of an estate." *Otto Preminger Films, Ltd. v. Qintex Entm't, Inc. (In re Qintex Entm't, Inc.),* 950 F.2d 1492, 1495 (9th Cir. 1991). Further, Section 105(a) allows the court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."

20.    A bankruptcy court's power to authorize a sale under section 363(b) is to be exercised at the court's discretion. *In re WPRV-TV,* 983 F.2d 336, 340 (1st Cir. 1993); *New Haven Radio, Inc. v. Meister (In re Martin-Trigona),* 760 F.2d 1334, 1346 (2d Cir. 1985); *Lionel,* 722 F.2d at 1069; *Stephens Indus., Inc. v. McClung,* 789 F.2d 386, 390-91 (6th Cir. 1986).

21.    Courts within the Ninth Circuit have authorized a sale of all or substantially all of a debtor's assets pursuant to section 363 when there is a good business reason for so doing. *See, e.g., In re Am. Dev. Corp.,* 95 BR 735, 739 (Bankr. C.D. Cal. 1989) (among the

Page 11 of 20 – **MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF**

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97204
www.leonard-law.com

Case 19-62049-tmr11    Doc 48    Filed 08/19/19

factors that determines whether a good business reason exists is whether the sale is in the best interests of the estate's creditors); *In re Photocopy & Supply, Inc.*, 1994 WL 553065 at *1 (Bankr. D. Idaho 1994) (a sale of substantially all of the debtor's assets was authorized, in the absence of a reorganization plan, when justified by a good business reason); *see also In re Martin*, 91 F.3d 395 (3d Cir. 1996); *Lionel*, 722 F.2d at 1071; *In re Titusville Country Club*, 128 B.R. 396 (Bankr. W.D. Pa. 1991).

22.     Courts have also required that a debtor provide reasonable and adequate notice of the sale, that the sale price be fair and reasonable, and that the sale be the result of good faith negotiations with the buyer. *See, e.g., In re Ewell*, 958 F.2d 276 (9th Cir. 1992) (declining to set aside or modify a sale pursuant to 11 U.S.C. § 363 because the price was fair and reasonable and buyer was a good faith purchaser pursuant to 11 U.S.C. § 363(m)); *In re King-Wilson*, 1998 U.S. Dist. LEXIS 16595, at *11-12 (N.D. Cal. Oct. 13, 1998); *In re Canyon P'ship*, 55 B.R. 520 (Bankr. S.D. Cal. 1985); *see also In re Abbotts Dairies of Pa.*, 788 F.2d 143, 147-50 (3d Cir. 1986): *In re Tempo Tech. Corp.*, 202 B.R. 363, 367 (D. Del. 1996*), aff'd sub nom. Diamond Abrasives Corp. v. Temtechco, Inc. (In re Temtechco, Inc.)*, 141 F.3d 1155 (3d Cir. 1998).

23.     In *Lionel*, the Second Circuit Court of Appeals held that the standard for the proper exercise of the debtor's discretion is a good business reason. *Id.* at 1071. The court adopted, in part, the following criteria for evaluating whether a good business reason exists for authorizing a sale of substantially all of the assets of a debtor:

(1)     The proportionate value of the asset to the estate as a whole;

(2)     The amount of elapsed time since the filing of the petition;

(3)     The likelihood that a plan will be proposed and confirmed in the near future;

(4)     The effect of the proposed disposition on future plans of reorganization; and

(5)     Most importantly, whether the assets to be sold are decreasing or increasing in value.

**MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF**

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97204
www.leonard-law.com

24.     The Debtor respectfully submits that the proposed sale of substantially all of the Debtor's assets as set forth herein is entirely consistent with the guidelines set forth in *Lionel* and applicable law. A prompt sale will maximize the amount that the Debtor, its estate and its creditors may realize for the value of the assets. The terms and conditions of the Auction and the Sale Procedures are fair and reasonable and in the best interest of the Debtor, its creditors, and the estate. The proposed sale should, therefore, be approved.

25.     Moreover, the Agreement is the product of substantial good faith, arms'-length negotiations between the Debtor and Buyer. The price and the form and structure of the proposed sale will be tested in the marketplace. The Sale Procedures provide certain protections to Buyer while maximizing the opportunity for competing bids. Thus, the Debtor is confident that the winning bid that emerges from this process will be the highest and best bid obtainable for the Purchased Assets in the circumstances.

26.     One of the more important factors to be considered in a sale of substantially all of the assets of a debtor under section 363(b) is whether the value of the debtor's assets will decline. *Lionel Corp.*, 722 F.2d at 1071. Such consideration is often dispositive. *In re Boogaart of Florida, Inc.*, 17 B.R. 480, 483-84 (Bankr. S.D. Fla. 1981) ("Where . . . the value of the assets is rapidly decreasing and the estates are suffering continuing losses, liquidation of assets prior to the proposal and confirmation of plans of reorganization may be desirable because it will ultimately increase the amounts distributed to creditors after plans are confirmed.").

27.     In this case, the Debtor's assets could rapidly become a "melting ice cube" but for the cooperation of various secured and unsecured creditors. Debtor's existing cash flow does not satisfy its existing debt service requirements. Over the past several years, Debtor's business was able to continue only because certain insiders and other parties continued to invest and lend capital to the Debtor. Despite these investments, Debtor defaulted on its payment obligations to secured creditors, and faced a foreclosure sale in the absence of this chapter 11 filing. The Debtor's cash flow will not increase without substantial additional capital investment,

**MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF**

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97204
www.leonard-law.com

and the Debtor has found that it is impossible to raise additional capital with its current equity and debt structure.

28.     Delaying a sale could seriously jeopardize the value of the Debtor's business assets. The existing value of the Debtor's business assets is directly related to its continued operations. In order to preserve its customer base and the value of its business assets, the Debtor must continue to operate its business in an orderly manner throughout the sale process to ensure that employee and customer impacts are kept to a minimum – a state of affairs that will increase in difficulty if the business is subject to a protracted sale process and bankruptcy proceeding. A protracted or piecemeal liquidation/sale process would likely lead to service disruptions, which in turn would results in impaired customer and vendor relationships and ultimately to a substantial loss to the customer base and value of the Debtor's estate.

29.     The prompt sale of substantially all of the assets of the business as a going concern will provide the greatest value to creditors and is the best outcome for all parties in interest.

B.     Sale Free and Clear of Liens and Other Interests

30.     The Debtor requests authorization to sell the Purchased Assets free and clear of all liens and other interests. Section 363(f) of the Bankruptcy Code authorizes a debtor in possession to sell property "free and clear of any interest in such property of an entity other than the estate" if one or more of the following conditions is satisfied:

(1)     applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is bona fide dispute; or

//

**MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF**

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97204
www.leonard-law.com

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Consistent with the use of the term elsewhere in the Bankruptcy Code, courts construe the term "interest" broadly to include all legal and equitable interests in the property and arising from the property. *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003) ("interests" is read expansively to include obligations that may flow from ownership of the property).

31.     Applicable case law provides that a sale of a debtor's assets free and clear of liens, interests and encumbrances, with such liens, interests and encumbrances attaching to the net proceeds of the sale, is permissible under section 363(f). *See, e.g., In re Goffena*, 175 B.R. 386, 387 (Bankr. D. Mont. 1994); *In re Granite Lumber Co.*, 63 B.R. 466, 471 (Bankr. D. Mont. 1986); *see also Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000) ("[T]he holdings of the courts suggest that any interest in property that can be reduced to a money satisfaction constitutes a claim for purposes of § 363(f) and, therefore, attaches to the proceeds of the sale."); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).

32.     One or more of the conditions set forth in section 363(f) are satisfied here with regard to each of the security interests of the Debtor's prepetition creditors. In addition, the absence of an objection by holders of interests in the assets to be sold can constitute consent to the sale free and clear of such claims and interests, satisfying section 363(f)(2). *See Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) (in a sale conducted pursuant to section 363 of the Bankruptcy Code, "lack of objection (provided of course there is notice) counts as consent"); *In re Tabone, Inc.*, 175 BR 855, 858 (Bankr D.N.J. 1994); *Veltman v. Whetzal*, 93 F3d 517 (8th Cir 1996). The Debtor believes all of its secured creditors will consent to the proposed sale. The Debtor further believes that the requirements of 11 U.S.C. § 363(f)(3) and (f)(4) (with respect to one or more liens) will be met.

//

//

**MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF**

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97204
www.leonard-law.com

C.  Sale in Good Faith

33.  Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) and (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Ninth Circuit has held that:

> For purposes of § 363(m), a "good faith purchaser" is one who buys "in good faith" and "for value." This court has said that lack of good faith is shown by "fraud, collusion between the purchaser and the trustee, or an attempt to take grossly unfair advantage of other bidders."

*In re Serzow*, 1994 U.S. App. LEXIS 16392, at *4-6 (9th Cir. June 28, 1994) (citations omitted); *In re Ewell*, 958 F.2d 276, 281 (9th Cir. 1992).

34.  The Debtor submits, and if necessary will present evidence at the Sale Hearing showing, that the negotiation of the Agreement was conducted in a fair manner, and that due to the open and competitive nature of the Auction, the Agreement or any purchase agreement finalized by another Successful Bidder will, by definition, be the result of arms'-length negotiations in good faith, and the Successful Bidder is entitled to all the benefits of section 363(m).

D.  The Expense Reimbursement

35.  The Agreement provides that, in the event Buyer is not the Successful Bidder, the Successful Bidder shall pay to Buyer, within three days following the entry of the Sale Order, the Expense Reimbursement. "Stalking horse" purchasers in asset sales often seek break-up fees or other forms of protection in the event they are not the successful purchasers, and courts have often approved such incentives, deferring to debtors' business judgment that such incentives are necessary in order to induce the initial bidder to step forward. *See, e.g., In re 995*

**MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF**

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97204
www.leonard-law.com

*Fifth Ave. Assocs., L.P.*, 96 BR 24, 28 (Bankr. S.D.N.Y. 1989) (holding that bidding incentives may be necessary to "convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted). Even courts that have rejected the "business judgment" test for evaluating break-up fees as a bidding incentive have indicated that bidding incentives would be appropriate where they provide a benefit to the debtor's estate. *See, e.g., In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 533 (3d Cir. 1999) (stating that bidding incentives benefit the estate where they (i) promote "more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited," or (ii) induce a bidder to submit a bid that serves as a "floor bid" on which other bidders can rely).

36.     The Debtor submits that the Expense Reimbursement is reasonable and appropriate in the circumstances of this case. Given its modest amount, its non-arbitrary basis in underline(actual) costs, and the material benefits which will inure to the estate and creditors as the result of a going concern sale (as opposed to a liquidation) – including the establishment of a floor price for the assets to be sold – the Debtor submits that the Expense Reimbursement should be approved.

E.     Assumption and Assignment of Executory Contracts and Unexpired Leases

37.     As set forth above, the Agreement allows Buyer or other Successful Bidder to request that the Debtor assume and assign certain contracts and leases. The Bankruptcy Code authorizes a debtor in possession to assume or reject an executory contract or unexpired lease, subject to bankruptcy court approval, providing that:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

**MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF**

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97204
www.leonard-law.com

(C) provides adequate assurance of future performance under such
contract or lease.

11 U.S.C. § 365(a), (b)(1).

38.    The meaning of "adequate assurance of future performance" depends on
the facts and circumstances of each case, but should be given "practical pragmatic construction."
*See*, e.g., *In re Great Nw. Recreation Ctr., Inc.*, 74 B.R. 846 (Bankr. D. Mont. 1987); *see also Carlisle
Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1988); *In re
Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single
solution will satisfy every case, the required assurance will fall considerably short of an absolute
guarantee of performance"). Buyer's promise to perform from and after the Closing Date with
respect to Assumed Contracts and Assumed Leases constitutes adequate assurance of future
performance in satisfaction of the requirements of section 365 of the Bankruptcy Code.

39.    The standard that is applied in the Ninth Circuit for determining whether
an executory contract or unexpired lease should be assumed is the debtor's "business judgment"
that the assumption is in its economic best interests. *See In re GI Indus., Inc.*, 204 F.3d 1276, 1282
(9th Cir. 2000) ("a bankruptcy court applies the business judgment rule to evaluate a trustee's
rejection decision"); *see also Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.* (*In re Sharon
Steel Corp.*), 872 F.2d 36, 40 (3d Cir. 1989); *In re III Enters., Inc. V*, 163 B.R. 453, 469 (Bankr.
E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or
reject a contract. A debtor need only show that its decision to assume or reject the contract is an
exercise of sound business judgment- a standard which we have concluded many times is not
difficult to meet.") (citations omitted). *Cf. Agarwal v. Pomona Valley Med. Group, Inc.* (*In re
Pomona Valley Med. Group, Inc.*), 476 F.3d 665 (9th Cir. 2007) (DIP's rejection of contract was
permitted unless based on bad faith, whim or caprice, or on unreasonable strategy).

40.    Under the Agreement, the Debtor will be responsible for cure costs that
are required to be paid under section 365 as a condition of the assumption and assignment of the
contacts and leases designated by Buyer.

**MOTION FOR ORDERS AUTHORIZING AND
SCHEDULING AN AUCTION FOR THE SALE OF
SUBSTANTIALLY ALL ASSETS OF THE DEBTOR
AND RELATED RELIEF**

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97204
www.leonard-law.com

F.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

41.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Bankruptcy Rule 6006(d) similarly provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under§ 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtor requests that any order authorizing it to sell the Purchased Assets and to assign the Material Agreements be effective immediately by providing that the 14-day stay of Bankruptcy Rules 6004(h) and 6006(d) will not apply.

42.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Bankruptcy Rules 6004(h). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay, a leading bankruptcy treatise suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶ 6004.10 (15th ed. rev. 2006). That treatise further suggests that if an objection is overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to seek a stay, unless the court determines that the need to proceed sooner outweighs the interests of the objecting party. *Id.*

43.    The Debtor requests that the Court rule that the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d) be waived so that the sale to Buyer can close immediately after the entry of the Sale Order. This is necessary to protect the value of the Purchased Assets and to ensure that the estate will not continue to be depleted by ongoing operations for which it has insufficient capital.

//

**MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF**

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97204
www.leonard-law.com

## NOTICE

Notice of this Motion has been given to (i) Buyer; (ii) the members of the Creditors' Committee; (iii) the Secured Creditors; (iv) the Office of the United States Trustee; and (v) all parties requesting special notice in this Chapter 11 case. The Debtor submits that the foregoing constitutes good and sufficient notice and that no other or further notice need be given in the circumstances.  All creditors and other parties in interest will receive notice, consistent with Fed. R. Bankr. P. 2002(a)(2) and (c)(1), of (i) the Notice of Intent to Sell and (ii) the Bid Procedures, once approved. **Further notice of the hearing on this Motion will be filed and served upon the parties referenced above when a hearing is set.**

WHEREFORE, the Debtor requests entry of an order granting the relief requested herein and such other and further relief as is appropriate.

DATED:  August 19, 2019

LEONARD LAW GROUP LLC

By: /s/ Timothy A. Solomon
      Timothy A. Solomon, OSB 072573
      Justin D. Leonard, OSB 033736
      Holly C. Hayman, OSB 114146
      Proposed Counsel for Debtor and
      Debtor in Possession

**MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF**

**ASSET PURCHASE AGREEMENT**

among

**JUANITA'S SNACKS, LLC,**

and

**4 HIM FOOD GROUP, LLC,**

dated as of

August 14, 2019

{00292537:2}; 4840-8354-1144v.8 0103522-000019

# TABLE OF CONTENTS

**ARTICLE 1 DEFINITIONS** ................................................................................ 1

**ARTICLE 2 PURCHASE AND SALE** ............................................................. 1

    Section 2.1        Purchase and Sale of Assets ........................................... 1
    Section 2.2        Excluded Assets ............................................................... 2
    Section 2.3        Assumed Liabilities ......................................................... 3
    Section 2.4        Excluded Liabilities ......................................................... 3
    Section 2.5        Purchase Price and Payment ........................................... 4
    Section 2.6        Third Party Consents ...................................................... 5
    Section 2.7        Allocation of Purchase Price ........................................... 5
    Section 2.8        Title to Purchased Assets ................................................ 6

**ARTICLE 3 CLOSING** ...................................................................................... 6

    Section 3.1        Closing .............................................................................. 6
    Section 3.2        Closing Deliverables ....................................................... 6

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER** ....... 7

    Section 4.1        Organization and Qualification of Seller ....................... 7
    Section 4.2        Authority of Seller .......................................................... 8
    Section 4.3        No Conflicts; Consents .................................................... 8
    Section 4.4        Financial Statements ....................................................... 8
    Section 4.5        Undisclosed Liabilities .................................................... 9
    Section 4.6        Absence of Certain Changes, Events, and Conditions..... 9
    Section 4.7        Assigned Contracts ......................................................... 10
    Section 4.8        Title to Purchased Assets ............................................... 10
    Section 4.9        Condition of Assets ......................................................... 10
    Section 4.10      Real Property .................................................................. 11
    Section 4.11      Intellectual Property ...................................................... 11
    Section 4.12      Inventory ......................................................................... 12
    Section 4.13      Insurance ......................................................................... 12
    Section 4.14      Legal Proceedings; Governmental Orders .................... 12
    Section 4.15      Compliance With Laws; Permits .................................... 13
    Section 4.16      Environmental Matters .................................................. 13
    Section 4.17      Taxes ................................................................................ 14
    Section 4.18      Brokers ............................................................................ 14
    Section 4.19      Product Quality Liability ............................................... 14

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER** ........ 15

    Section 5.1        Organization of Buyer .................................................... 15
    Section 5.2        Authority of Buyer ......................................................... 15
    Section 5.3        No Conflicts; Consents .................................................... 15
    Section 5.4        Brokers ............................................................................ 15
    Section 5.5        Legal Proceedings .......................................................... 15

**ARTICLE 6 COVENANTS** ................................................................................ 16

    Section 6.1        **Conduct of Business Prior to the Closing Date** ............................. 16
    Section 6.2        **Efforts.** ................................................................................ 16
    Section 6.3        **Due Diligence** ...................................................................... 16
    Section 6.4        **Assistance in Respect of Applications for Licenses, Permits,**
                             **Consents, and Approvals** ...................................................... 18
    Section 6.5        **[INTENTIONALLY OMITTED]** ............................................. 18
    Section 6.6        **Notice of Certain Events** ........................................................ 18
    Section 6.7        **Supplement to Disclosure Schedules** ...................................... 18
    Section 6.8        **Employees** ........................................................................... 19
    Section 6.9        **Title Insurance** .................................................................... 19
    Section 6.10      **Confidentiality** .................................................................... 19
    Section 6.11      **Public Announcements** ......................................................... 20
    Section 6.12      **Books and Records** ............................................................... 20
    Section 6.13      **Accounts Receivable** ............................................................ 20
    Section 6.14      **Insurance** ............................................................................ 20
    Section 6.15      **Transfer Taxes** .................................................................... 20
    Section 6.16      **Further Assurances** .............................................................. 21

**ARTICLE 7 BANKRUPTCY MATTERS** .......................................................... 21

    Section 7.1        **Court Approval** ................................................................... 21
    Section 7.2        **Sale Motion** ........................................................................ 21
    Section 7.3        **Service of Sale Motion** .......................................................... 22
    Section 7.4        **Comment by Buyer** .............................................................. 22
    Section 7.5        **Stalking Horse Provisions** ..................................................... 22

**ARTICLE 8 CONDITIONS TO CLOSING** ....................................................... 23

    Section 8.1        **Conditions to Obligations of Buyer** ........................................ 23
    Section 8.2        **Conditions to Obligations of Seller** ........................................ 25

**ARTICLE 9 INDEMNIFICATION** ................................................................... 26

    Section 9.1        **Survival** .............................................................................. 26
    Section 9.2        **Indemnification By Seller** ..................................................... 26
    Section 9.3        **Indemnification By Active Members** ...................................... 27
    Section 9.4        **Indemnification By Buyer** ..................................................... 27
    Section 9.5        **Certain Limitations** ............................................................. 28
    Section 9.6        **Indemnification Procedures** .................................................. 29
    Section 9.7        **Payments** ............................................................................ 30
    Section 9.8        **Tax Treatment of Indemnification Payments** ........................... 30
    Section 9.9        **Exclusive Remedies** ............................................................. 30
    Section 9.10      **Mitigation** ........................................................................... 31

**ARTICLE 10 TERMINATION** ......................................................................... 31

    Section 10.1      **Termination** ........................................................................ 31
    Section 10.2      **Effect of Termination** ........................................................... 31

**ARTICLE 11 MISCELLANEOUS** ................................................................................ **32**

      **Section 11.1**      **Expenses** ................................................................................ **32**
      **Section 11.2**      **Notices** .................................................................................... **32**
      **Section 11.3**      **Interpretation** ......................................................................... **33**
      **Section 11.4**      **Headings** .................................................................................. **33**
      **Section 11.5**      **Severability** ............................................................................ **33**
      **Section 11.6**      **Entire Agreement** ................................................................... **33**
      **Section 11.7**      **Successors and Assigns** ......................................................... **33**
      **Section 11.8**      **No Third-party Beneficiaries** .............................................. **34**
      **Section 11.9**      **Amendment and Modification; Waiver** ............................... **34**
      **Section 11.10**      **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial** ............................................................................... **34**
      **Section 11.11**      **Specific Performance** ............................................................. **35**
      **Section 11.12**      **Counterparts** .......................................................................... **35**

**EXHIBITS**

| Exhibit A | - | Allocation Schedule |
| Exhibit B | - | Form of Bill of Sale |
| Exhibit C | - | Form of Deed |
| Exhibit D | - | Form of Assignment and Assumption Agreement |
| Exhibit E | - | Form of Intellectual Property Assignment |
| Exhibit F | - | Form of Bid Procedures Order |

**SCHEDULES**

Disclosure Schedules
| Schedule 2.1(a) | Real Property |
| Schedule 2.1(e) | Assigned Contracts |
| Schedule 2.3 | Assumed Liabilities |
| Schedule 8.1(s) | Key Employees |

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of August 14, 2019 (the "**Effective Date**"), is entered into by and among Juanita's Snacks, LLC, an Oregon limited liability company ("**Buyer**"), and 4 Him Food Group, LLC, an Oregon limited liability company ("**Seller**"). Buyer and Seller are each a "**Party**" and collectively "**Parties**."

## RECITALS

A.      Seller is engaged in the business of manufacturing, marketing and distributing snack foods and other activity incidental or related thereto (the "**Business**").

B.      Seller owns and uses certain brand and trade names, logos, trademarks, taglines, and associated goodwill in connection with the COSMOS CREATIONS and MASALA POP product lines of the Business (the "**Brands**").

C.      On July 2, 2019 (the "**Petition Date**"), Seller filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code, Section 101 et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Oregon (the "**Bankruptcy Court**"), captioned *In re 4 Him Food Group, LLC*, Case No. 19-62049-tmr11 (hereinafter, the "**Bankruptcy Case**").

D.      Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, substantially all the assets used or held for use by the Company in the conduct of the Business under the Brands, and the Buyer proposed to assume certain of the liabilities and obligations of Seller, on the terms and conditions set forth in this Agreement (such transaction, and the related transactions described below, the "**Transactions**").

E.      The Parties intend to effectuate the Transactions pursuant to an order of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code (the "**Sale Order**").

F.      The execution and delivery of this Agreement and Seller's ability to consummate the Transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

All capitalized terms that are used but not defined herein shall have the respective meanings ascribed thereto in <u>Annex A</u>.

## ARTICLE 2
## PURCHASE AND SALE

**Section 2.1      Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of any Encumbrances other than the Assumed Liabilities (as set forth in this Agreement) and Permitted Encumbrances, all right, title and interest in, to and under the following assets, properties and rights, whether real, personal or mixed, tangible or intangible, which are used to conduct

with the Business, or held for use in connection with the Business or the Brands (collectively, the "**Purchased Assets**"):

        (a)      the Real Property identified on <u>Schedule 2.1(a)</u>, together with all (i) buildings, structures, and improvements located on such premises, (ii) rights of and appurtenances to such premises, including all water, water rights and easements that benefit said premises, (iii) oil, gas and other mineral rights interests Seller has in such premises, and (iv) all and singular, the estates, rights, privileges, easements, entitlements, and appurtenances belonging or in any way appertaining to the Real Property and its improvements;

        (b)      all Intellectual Property Assets;

        (c)      all fixed or tangible property of the Seller including, without limitation, any and all fixtures, fixed assets, vehicles, furniture, furnishings, equipment, computers and related software and manuals ("**Equipment**");

        (d)      all raw materials, finished goods, work in progress, packaging, supplies, ingredients and other inventories ("**Inventory**");

        (e)      those Contracts set forth on <u>Schedule 2.1(e)</u> (the "**Assigned Contracts**");

        (f)      all accounts receivable of Seller for sales of inventory by Seller not more than 60 days prior to the Closing;

        (g)      all marketing, promotional, and merchandising materials related to the Business;

        (h)      all rights to any Actions of any nature available to or being pursued by Seller to the extent related to the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise;

        (i)      all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

        (j)      all Permits, accreditations, qualifications or similar rights to the extent that they are assignable, including, without limitation, those related to the Real Property and those set forth on **Section 4.15(b)** of the Disclosure Schedules;

        (k)      all goodwill related to the Business; and

        (l)      all information, books and records relating to the Business, including without limitation, all records, accounting or other books and records of the Business, files, papers, and files, telephone numbers, customer, supplier, price and contact lists, other customer information, vendor information, marketing/buyer group information, sales, leasing and purchase correspondence, ALTA survey, Hazardous Materials reports and studies and all other information regarding Hazardous Materials, all information regarding litigation and governmental action regarding the Real Property, a copy of all land use applications, permits, approvals, plats, engineering work, books of account, sales records, and financial and employment records, data, plans, reports and recorded knowledge relating to the Business in whatever media retained or stores, including, without limitation, computer software (collectively, the "**Books and Records**").

        **Section 2.2**      **Excluded Assets.** Buyer shall not acquire any right, title or interest in, to or under

the assets, properties and rights of Seller or its Affiliates not set forth in **Section 2.1**, including the following (collectively, the "**Excluded Assets**"):

> (a)    Contracts that are not specifically designated Assigned Contracts (the "**Excluded Contracts**");

> (b)    the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization or taxes of Seller;

> (c)    cash or cash equivalents and all rights to any bank accounts of the Seller, including checkbooks, cancelled checks and bank records;

> (d)    the items set forth in **Section 2.2(d)** of the Disclosure Schedules;

> (e)    any Permit or similar right that by its terms is not transferable to the Purchaser, and are indicated on **Section 4.15(b)** of the Disclosure Schedules as not being transferable; and

> (f)    the rights which accrue or will accrue to Seller under the Transaction Documents.

**Section 2.3     Assumed Liabilities.** Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge only (i) the Liabilities specifically listed on **Section 2.3** of the Disclosure Schedules, or (ii) those Liabilities in respect of the Assigned Contracts, if any, to the extent that such Liabilities thereunder, were incurred in the ordinary course of business and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Seller on or prior to the Closing (the "**Assumed Liabilities**").

**Section 2.4     Excluded Liabilities.** Notwithstanding the provisions of **Section 2.3** or any other provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**"). Seller shall, and shall cause each of its Affiliates to, pay and satisfy in due course all Excluded Liabilities which they are obligated to pay and satisfy. Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following:

> (a)    any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation, and performance of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby, including fees and expenses of counsel, accountants, consultants, advisers and others;

> (b)    any Liability for (i) Taxes of Seller (or any shareholder or Affiliate of Seller) or relating to the Business, the Purchased Assets or the Assumed Liabilities for any Pre-Closing Tax Period; (ii) Taxes that arise out of the consummation of the transactions contemplated hereby or that are the responsibility of Seller pursuant to **Section 6.15**; or (iii) other Taxes of Seller (or any member or Affiliate of Seller of any kind or description) including any Liability for Taxes of Seller (or any shareholder or Affiliate of Seller) that becomes a Liability of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law;

> (c)    any Liabilities relating to or arising out of the Excluded Assets;

> (d)    any Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets to the extent such Action relates to such operation on or prior to the Closing Date;

(e)     any product Liability or similar claim for injury to a Person or property which arises out of or is based upon any express or implied representation, warranty, agreement or guaranty made by Seller, or by reason of the improper performance or malfunctioning of a product (including Inventory), improper design or manufacture, failure to adequately package, label or warn of hazards or other related product defects of any products (including Inventory) at any time held, manufactured, or sold by, or any service performed by, Seller;

(f)     any recall, design defect or similar claims of any products (including Inventory) held, manufactured, or sold by, or any service performed by, Seller on or prior to the Closing;

(g)     any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments;

(h)     any trade accounts payable of Seller (i) to the extent not accounted for on the Balance Sheet; (ii) that are not disclosed in **Section 4.5** of the Disclosure Schedules; (iii) which constitute intercompany payables owing to Affiliates of Seller; (iv) which constitute debt, loans or credit facilities to financial institutions; or (v) which did not arise in the ordinary course of business;

(i)     any Liabilities of the Business relating or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders that (i) do not constitute part of the Purchased Assets issued by the Business' customers to Seller on or before the Closing; (ii) did not arise in the ordinary course of business; or (iii) are not validly and effectively assigned to Buyer pursuant to this Agreement;

(j)     any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Seller (including with respect to any breach of fiduciary obligations by same), except for indemnification of same pursuant to **Section 9.4** as Seller Indemnitees;

(k)     any Liabilities under the Excluded Contracts;

(l)     any Liabilities of Seller arising from any present or former holders or alleged holders of securities of Seller; and

(m)     any Liabilities arising out of, in respect of or in connection with the failure by Seller or its Affiliates to comply with any Law or Governmental Order.

### Section 2.5     Purchase Price and Payment.

(a)     <u>Purchase Price</u>.  The aggregate consideration to be paid to Seller by Buyer for the Purchased Assets shall be: (i) Buyer's assumption of the Assumed Liabilities (as explicitly set forth in this Agreement); (ii) Buyer's credit bid in the amount of Buyer's secured claim against (a) the book value of Seller's usable and non-obsolete Inventory, and (b) the book value of Seller's current accounts receivable for sales of inventory by Seller not more than 60 days prior to the Closing; plus (iii) cash in the sum of (the "**Purchase Price**") Nine Million Dollars ($9,000,000).

(b)     <u>Inventory and Accounts Receivable Adjustment</u>. No later than three (3) days before Closing, Seller will provide to Buyer an estimate of the book value of Seller's usable and non-obsolete inventory and current (less than 60 days) accounts receivable (the "**Estimated Adjustment**").

(c)      Prorations. At Closing, Buyer and Seller shall reimburse each other, as appropriate, for all real property and personal property Taxes and utility expenses and assessments related to the Real Property, Equipment or Inventory included in the Purchased Assets, which shall be prorated on the basis of the number of days of the relevant time period which have elapsed through the Closing, with Seller being responsible for that portion relating to the period prior to and as of the Closing Date and Buyer being responsible for that portion relating to the period after the Closing Date.

(d)      Closing Payment. At Closing Buyer will pay to the Seller the Purchase Price (including the Estimated Adjustment), adjusted by any prorations in **Section 2.5(c)** (such net amount, the "**Closing Payment**"), by wire transfer of immediately payable funds.

(e)      Post-Closing True Up. No later than 30 days after Closing, Buyer shall determine and submit to Seller the actual book value of Seller's usable and non-obsolete Inventory and current (less than 60 days) accounts receivable as of the Closing Date (the "**True-Up Adjustment**"). If Seller accepts the True-Up Adjustment, or if Seller fails to give notice to Buyer of any objection within 30 days after receipt of the True-Up Adjustment ("**Notice**"), the True-Up Adjustment shall be the final and binding calculation. If Seller gives Notice to Buyer of an objection to the True-Up Adjustment within 30 days after receipt of the True-Up Adjustment, the Buyer and Seller shall attempt in good faith to resolve their differences. If Buyer and Seller are able to resolve their differences, the True-Up Adjustment, as modified to reflect the resolution of the differences between Buyer and Seller, shall be the final and binding calculation. If, however, Buyer and Seller are unable to resolve their differences, the Buyer and Seller shall submit any disputed items to final and binding arbitration in Portland, Oregon by a single arbitrator. Each Party shall submit what it believes would be the fair True-Up Adjustment together with its supporting evidence at a single arbitration hearing. The parties shall use their good faith efforts to complete any such arbitration within 30 days of the request for arbitration. The determination of the True-Up Adjustment by the arbitrator shall be final and binding on Seller and Buyer.

(f)      Payment of True-Up Adjustment. If the final True-Up Adjustment, as determined by **Section 2.5(e)**, is less than the Estimated Adjustment, Seller shall promptly pay the difference as directed by Buyer within one (1) business day of the final determination. If the final True-Up Adjustment, as determined by **Section 2.5(e)**, exceeds the Estimated Adjustment, Buyer shall promptly pay the difference as directed by Seller within one (1) business day of the final determination.

(g)      Grant Agreement. In addition to the Purchase price, at Closing the Buyer and Old Cosmos HoldCo shall enter into the Grant Agreement.

**Section 2.6      Third Party Consents.** To the extent that Seller's rights under any Contract constituting a Purchased Asset, or any other Purchased Asset, may not be assigned to Buyer without the consent of another Person which has not been obtained, as set forth on **Section 4.3** of the Disclosure Schedules, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall obtain any such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by law and such Contract, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and such Contract, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer.

**Section 2.7      Allocation of Purchase Price.** Seller and Buyer agree to allocate the Purchase Price among the Purchased Assets for all Tax purposes in accordance with Code Section 1060 and applicable Treasury Regulations and in accordance with the methodology shown on the allocation schedule

attached hereto as Exhibit A (the "**Allocation Schedule**"). Buyer and Seller shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with the Allocation Schedule.

Section 2.8 **Title to Purchased Assets.** Seller and Buyer agree that ownership and title to the respective Purchased Assets shall be allocated among the Buyer and its affiliated entities as Buyer determines in its sole and absolute discretion prior to the Closing. For the avoidance of doubt, the Parties acknowledge and agree that title to the Real Property shall be delivered to D-9 Holdings, LLC, an affiliate of the Buyer, and Equipment shall be delivered to Dominguez Equipment LLC, an affiliate of Buyer. The Parties further acknowledge and agree that title to the remainder of the Purchased Assets is likely to be delivered to Buyer.

# ARTICLE 3
# CLOSING

Section 3.1 **Closing.** The consummation of the transactions contemplated by this Agreement (the "**Closing**") will take place remotely on the date of the satisfaction or waiver of all of the conditions to the obligations of the Parties to consummate the transactions contemplated hereby, or such other date as may be mutually agreed to by the Parties (the "**Closing Date**") and will be effective as of 12:01 a.m. Pacific time on the Closing Date. All proceedings to be taken and all documents to be executed and delivered by the Parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed taken nor any documents executed or delivered until all have been taken, executed, and delivered.

Section 3.2 **Closing Deliverables.**

(a) At the Closing, Seller shall deliver to Buyer the following, each in form and substance satisfactory to Buyer, in its sole discretion:

(i) a bill of sale in the form of Exhibit B hereto (the "**Bill of Sale**") and duly executed by Seller, transferring the tangible personal property included in the Purchased Assets to Buyer;

(ii) with respect to each parcel of Real Property, a statutory warranty deed in the form of Exhibit C hereto (each, a "**Deed**") duly executed and notarized by the Seller subject only to the Permitted Encumbrances;

(iii) an assignment and assumption agreement, in the form of Exhibit D hereto (the "**Assignment and Assumption Agreement**") and duly executed by Seller, affecting the assignment to and assumption by Buyer of the Assigned Contracts and the Assumed Liabilities;

(iv) an assignment in the form of Exhibit E hereto (the "**Intellectual Property Assignment**") and duly executed by Seller, transferring all of Seller's right, title and interest in and to the Intellectual Property Assets to Buyer, including an assignment in a form to be recorded with the United States Patent and Trademark Office;

(v) pay-off letter(s), deed(s) of reconveyance, or other evidence satisfactory to Buyer, evidencing the release or discharge of all Encumbrances, except Permitted Encumbrances, relating to the Purchased Assets;

(vi)    written consents or notices necessary or desirable to complete the transactions contemplated hereby from the parties as set forth on **Section 4.3** of the Disclosure Schedules, (all such consents and waivers shall be in full force and effect);

(vii)    Seller's Closing Certificate;

(viii)    a certificate of the Secretary of State (or other applicable office) in which Seller is organized and qualified to do business, dated as of a date not more than five (5) Business Days prior to the Closing Date, certifying as to the good standing and non-delinquent Tax status of Seller;

(ix)    a FIRPTA Certificate duly executed by Seller;

(x)    Seller's Secretary Certificate.

(b)    At the Closing, Buyer shall deliver to Seller the following:

(i)    the amount set forth in **Section 2.5(d)**;

(ii)    the Assignment and Assumption Agreement, duly executed by Buyer;

(iii)    the Intellectual Property Assignments, duly executed by Buyer;

(iv)    the Strasheim Employment Agreement, duly executed by Buyer;

(v)    a certificate of the Secretary of State (or other applicable office) in which Buyer is organized and qualified to do business, dated as of a date not more than five (5) Business Days prior to the Closing Date, certifying as to the good standing and non-delinquent Tax status of Buyer;

(vii)    the Grant Agreement with Old Cosmos HoldCo;

(vi)    Buyer's Closing Certificate; and

(vii)    Buyer's Secretary Certificate.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, which exceptions shall be deemed to be part of the representations and warranties made hereunder, Seller represents and warrants to Buyer that the statements contained in this **Article 4** are true and correct as of the date hereof. The Disclosure Schedules shall be arranged in sections and subsections corresponding to the numbered and lettered sections and subsections contained in this **Article 4**, and the disclosures in any Section of the Disclosure Schedule shall qualify as disclosures with respect to other representations and warranties in other sections in this **Article 4** to the extent it is reasonably apparent on the face of such disclosure that such disclosure is applicable to such other representations and warranties.

**Section 4.1    Organization and Qualification of Seller.**  Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of Oregon and has all requisite power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted. **Section 4.1** of the Disclosure Schedules sets forth each jurisdiction in which Seller is licensed or qualified to do business, and Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets

or the operation of the Business as currently conducted makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not have a Material Adverse Effect. Seller has heretofore made available to Buyer true, correct and complete copies of Seller's organizational documents as currently in effect and Seller's record books with respect to actions taken by the Company's members and managers. Seller does not have any Subsidiaries.

Section 4.2    **Authority of Seller.**  Subject to the Sale Order becoming a final, non-appealable order, Seller has full power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Seller. This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by each other party hereto) this Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). When each other Transaction Document to which Seller is or will be a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Seller enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 4.3    **No Conflicts; Consents.**  The execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any organizational documents of Seller; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller, the Business or the Purchased Assets; (c) except as set forth in **Section 4.3** of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract or Permit to which Seller is a party or by which Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (d) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on the Purchased Assets. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any of the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, except as set forth in **Section 4.3** of the Disclosure Schedules.

Section 4.4    **Financial Statements.**  Complete copies of the reviewed financial statements consisting of the combined and consolidated balance sheet of Seller as at December 31 in each of the years 2016 and 2017 and the related statements of income and retained earnings, stockholders' equity and cash flow for the years then ended (the "**Reviewed Financial Statements**"), and unreviewed financial statements consisting of the balance sheet of Seller as of December 31, 2018 and April 30, 2019 and the related statements of income and retained earnings, stockholders' equity and cash flow for the twelve-month and four-month periods, respectively, then ended (the "**Unreviewed Financial Statements**" and together with the Reviewed Financial Statements, the "**Financial Statements**"), have been delivered to

Buyer. The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, subject, in the case of the Unreviewed Financial Statements, to normal and recurring year-end adjustments (the effect of which will not be materially adverse). The Financial Statements are based on the books and records of the Business, and fairly present the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated. The balance sheet of Seller as of December 31, 2018 is referred to herein as the "**Balance Sheet**" and the date thereof as the "**Balance Sheet Date**." Seller maintains a standard system of accounting for the Business established and administered in accordance with GAAP.

Section 4.5 **Undisclosed Liabilities**. Seller has no Liabilities with respect to the Business, except (a) those which are adequately reflected or reserved against in the Financial Statements, (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date (provided that there is no such Liability that relates to breach of Contract, breach of warranty, tort, infringement, violation of Law, Order or Permit, or any Proceeding, in each case as in effect on or before the Closing Date), (c) those disclosed in Seller's Bankruptcy Petition and Schedules (Bankruptcy Case Docket No. 1), and (d) those disclosed in **Section 4.5** of the Disclosure Schedules.

Section 4.6 **Absence of Certain Changes, Events, and Conditions**. Except as disclosed in **Section 4.6** of the Disclosure Schedules, since the Balance Sheet Date, and other than in the ordinary course of business consistent with past practice, there has not been any:

      (a)    event, occurrence or development that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

      (b)    material change in any method of accounting or accounting practice for the Business, except as required by GAAP or as disclosed in the notes to the Financial Statements;

      (c)    the incurrence, assumption or guarantee of any indebtedness for borrowed money in connection with the Business except unsecured current obligations and Liabilities incurred in the ordinary course of business consistent with past practice;

      (d)    transfer, assignment, sale or other disposition of any of the Purchased Assets shown or reflected in the Balance Sheet, except for the sale of Inventory in the ordinary course of business;

      (e)    cancellation of any debts or claims or amendment, termination or waiver of any material rights constituting Purchased Assets;

      (f)    transfer, assignment or grant of any license or sublicense of any material rights under or with respect to any Intellectual Property Assets or Intellectual Property Agreements;

      (g)    material damage, destruction or loss, or any material interruption in use, of any Purchased Assets, whether or not covered by insurance;

      (h)    acceleration, termination, material modification to or cancellation of any Assigned Contract;

      (i)    material capital expenditures which would constitute an Assumed Liability;

      (j)    imposition of any Encumbrance (other than Permitted Encumbrances) upon any of the Purchased Assets;

(k)      adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy Law or consent to the filing of any bankruptcy petition against it under any similar Law; or

(l)      any Contract to do any of the foregoing, or any action or omission that would result in any of the foregoing.

**Section 4.7      Assigned Contracts**. Complete and accurate copies of all written Assigned Contracts have been made available to Buyer.  With respect to each, Assigned Contract:

(a)      each Assigned Contract is legal, valid and binding on Seller and, to the Knowledge of Seller, the other parties thereto, enforceable in accordance with the terms thereof;

(b)      each Assigned Contract is in full force and effect;

(c)      neither Seller nor any of the other parties to any of the Assigned Contracts are in default or breach thereof, and Seller has received no notice of a claimed breach, or of the occurrence of any event which after the passage of time or the giving of notice or both would constitute a breach by any party to any Assigned Contract;

(d)      Seller has not waived any of its rights under any Assigned Contract;

(e)      Seller has not received any notice of termination of any Assigned Contract, nor has Seller received any notice of any facts or events that could result in any such termination;

(f)      none of the rights of Seller under the Assigned Contracts have been or will be impaired in any respect by the execution and delivery of this Agreement or the consummation of the transactions contemplated by this Agreement; and

(g)      to the Knowledge of Seller, no other party to any Assigned Contract has breached or is in default thereunder and there does not exist any event or condition that, with or without the lapse of time or the giving of notice, would become such a breach or default or would cause the acceleration or any obligation thereunder.

**Section 4.8      Title to Purchased Assets**. Seller has good and marketable title to all Purchased Assets, free and clear of all Encumbrances, except for (i) those Encumbrances described on **Section 4.8** of the Disclosure Schedules, and (ii) the Permitted Encumbrances.  None of the Purchased Assets are subject to any restrictions with respect to the transferability thereof and Seller has complete and unrestricted power and right to sell, assign, convey and deliver the Purchased Assets to Buyer as contemplated hereby.  At Closing, Buyer will receive good and marketable title to all the Purchased Assets, free and clear of all Encumbrances, except for the Permitted Encumbrances.

**Section 4.9      Condition of Assets**. The Equipment, Inventory and other tangible personal property that is a Purchased Asset are (i) structurally sound, (ii) in good operating condition and repair, (iii) adequate for the uses to which they are being put, and (iv) not in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. None of the Excluded Assets are material to the Business.

### Section 4.10    Real Property.

(a)    **Section 4.10(a)** of the Disclosure Schedules sets forth all real property owned by Seller and used in connection with the Business (collectively, the "**Real Property**"). Seller has fee simple title to the Real Property, free and clear of all Encumbrances, except Permitted Encumbrances. Seller has not leased or otherwise granted to any Person the right to use or occupy such Real Property or any portion thereof. There are no unrecorded outstanding options, rights of first offer or rights of first refusal to purchase such Real Property or any portion thereof or interest therein.

(b)    Seller has not received any written notice of existing, pending or threatened (i) Actions affecting the Real Property, or (ii) zoning, building code or other moratorium Actions, or similar matters that would reasonably be expected to adversely affect the ability to operate the Real Property as currently operated. Neither the whole nor any portion of any Real Property has been damaged or destroyed by fire or other casualty.

(c)    Each lot constituting the Real Property is assessed as a separate tax parcel by the taxing authorities having jurisdiction thereof, separate and apart from all other property. There are no special assessments, fees or charges (including any "impact fees" or charges in the nature thereof) of any kind or nature whatsoever levied or assessed or pending or contemplated against the Real Property by any Governmental Authority having jurisdiction of the Real Property, except as specifically approved by Buyer as a Permitted Encumbrance.

### Section 4.11    Intellectual Property.

(a)    **Section 4.11(a)** of the Disclosure Schedules lists all Intellectual Property Registrations and Intellectual Property Agreements. Except as would not have a Material Adverse Effect, Seller owns or has the right to use all Intellectual Property necessary to conduct the Business as currently conducted. All required filings and fees related to the Intellectual Property Registrations have been timely filed with and paid to the relevant Governmental Authorities and authorized registrars, and all Intellectual Property Registrations are otherwise in good standing.

(b)    Seller is the sole and exclusive legal and beneficial, and with respect to the Intellectual Property Registrations, record, owner of all right, title and interest in and to the Intellectual Property Assets, and has the valid right to use all other Intellectual Property used in or necessary for the conduct of the Business as currently conducted, in each case, free and clear of Encumbrances other than Permitted Encumbrances.

(c)    Seller's rights in the Intellectual Property Assets are valid, subsisting and enforceable. Seller has taken all reasonable steps to maintain the Intellectual Property Assets and to protect and preserve the confidentiality of all trade secrets included in the Intellectual Property Assets.

(d)    To the Knowledge of Seller, the Intellectual Property Assets have not, do not and will not infringe, dilute, misappropriate or otherwise violate, the Intellectual Property or other rights of any Person. No Person has infringed, misappropriated, diluted or otherwise violated, or is currently infringing, misappropriating, diluting or otherwise violating, any Intellectual Property Assets.

(e)    There are no Actions (including any oppositions, interferences or re-examinations) settled, pending or threatened (including in the form of offers to obtain a license): (i) alleging any infringement, misappropriation, dilution or violation of the Intellectual Property of any Person by Seller in connection with the Business; (ii) challenging the validity, enforceability, registrability or ownership of any Intellectual Property Assets or Seller's rights with respect to any Intellectual Property Assets; or (iii) by

**EXHIBIT A**
**Page 15 of 59**

Seller or any other Person alleging any infringement, misappropriation, dilution or violation by any Person of any Intellectual Property Assets. Seller is not subject to any outstanding or prospective Governmental Order (including any motion or petition therefor) that does or would restrict or impair the use of any Intellectual Property Assets.

Section 4.12    **Inventory.** Except as set forth on **Section 4.12** of the Disclosure Schedules, all of the Inventory of the Company reflected on the Balance Sheet, whether located at the premises of Seller or elsewhere, are of, and the Inventory of Seller on the Closing Date will consist of, a quantity and quality usable and saleable in the ordinary course of business, are not damaged or defective and are merchantable. All of the Inventory of Seller reflected on the Balance Sheet is validly owned by Seller and constitutes an asset of Seller. All of the Inventory of Seller, whether located at the premises of Seller or elsewhere, are, and as of the Closing Date will be, properly reflected on the Company's books and records and are not and, as of the Closing Date will not be, the subject of any counterclaim, or a claim for a charge back, deduction, credit, set off or other offset, or any claim of a party-in-possession, such as a claim for an Encumbrance or other restriction. The quantities of each item of Inventory (whether raw materials, work-in-process or finished goods) are not excessive, but are reasonable in the present circumstances of Seller. No Inventory has been adulterated or misbranded. Except as set forth on **Section 4.12** of the Disclosure Schedules, all of the Inventory, whether located at the premises of Seller or elsewhere, are and, as of the Closing Date will be, in compliance with all applicable Laws, including those pertaining to labeling and packaging and all Seller's products included in such Inventory comply in all respects with current FDA (as defined below in **Section 4.15**) and Federal Trade Commission requirements and the requirements of other Governmental Authorities and were handled in conformity with current FDA requirements and the requirements of other Governmental Authorities.

Section 4.13    **Insurance.** Except as set forth on **Section 4.13** of the Disclosure Schedules, there are no claims related to the Business, the Purchased Assets or the Assumed Liabilities pending under any insurance policies of Seller as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights. Neither Seller nor any of its Affiliates have received any written notice of cancellation of, premium increase with respect to, or alteration of coverage under, any of such insurance policies. All such insurance policies are in full force and effect and enforceable in accordance with their terms and have not been subject to any lapse in coverage. Neither Seller nor any of its Affiliates is in default under, or has otherwise failed to comply with in any material respect, any provision contained in any such insurance policy.

Section 4.14    **Legal Proceedings; Governmental Orders.**

(a)    Except as set forth in **Section 4.14(a)** of the Disclosure Schedules, and except for the Bankruptcy Case, there are no Actions pending or threatened in writing against or by Seller (a) relating to or affecting the Business, the Purchased Assets or the Assumed Liabilities or (b) that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that would reasonably be expected to give rise to, or serve as a basis for, any such Action.

(b)    Except as set forth in **Section 4.14(b)** of the Disclosure Schedules, there are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against the Business. Seller is in compliance with the terms of each Governmental Order set forth in **Section 4.14(b)** of the Disclosure Schedules. No event has occurred or circumstances exist that would reasonably be expected to constitute or result in (with or without notice or lapse of time) a violation of any such Governmental Order.

**Section 4.15    Compliance With Laws; Permits.**

(a)    Seller has complied, and is now complying, with Laws applicable to the conduct of the Business as currently conducted and the ownership and use of the Purchased Assets, including but not limited to those Law associated with the United States Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq., and applicable regulations, including the rules and regulations of the Food and Drug Administration ("**FDA**") promulgated thereunder. All manufacturing operations of the Business are being and, to the extent required by applicable Law, have been conducted in compliance in all material respects with applicable FDA good manufacturing practices and quality systems regulations.

(b)    Except as set forth on **Section 4.15(b)** of the Disclosure Schedules, the Seller has all Permits necessary for its operations in the conduct of the Business, such Permits are in full force and effect and no violations are or have been recorded in respect of any thereof, and no Proceeding is pending or threatened to revoke or limit any thereof.  Seller has taken all necessary action to maintain each Permit. **Section 4.15(b)** of the Disclosure Schedules contains a true, correct and complete list of all such Permits, including the names of the Permits and their respective dates of issuance and expiration, under which Seller is operating or bound, and Seller has provided the buyer with true, correct and complete copies of the Permits set forth on **Section 4.15(b)** of the Disclosure Schedules. Except as set forth on **Section 4.15(b)** of the Disclosure Schedules, none of the Permits set forth on **Section 4.15(b)** of the Disclosure Schedules shall be adversely affected as a result of Seller's execution and delivery of, or the performance of its obligations under, this Agreement or the consummation of the transactions contemplated hereby.

**Section 4.16    Environmental Matters.**

(a)    The operations of Seller with respect to the Business and the Purchased Assets have been and currently are in compliance with all Environmental Laws. Seller has not received in writing from any Person, with respect to the Business or the Purchased Assets, any: (i) Environmental Notice or Environmental Claim; or (ii) request for information pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

(b)    There has been no Release of Hazardous Materials (i) in contravention of Environmental Law; or (ii) in an amount requiring cleanup or reporting under Environmental Law with respect to the Business, the Purchased Assets or any Real Property, while owned and operated by Seller or, to the Knowledge of Seller, before being owned and operated by Seller, and Seller has not received any Environmental Notice that the Business or any of the Purchased Assets or Real Property has been contaminated with any Hazardous Material that would reasonably be expected to result in an Environmental Claim against, or a violation of Environmental Law or term of any Environmental Permit by, Seller.

(c)    Seller has not retained or assumed, by contract or, to the Knowledge of Seller, operation of Law, any liabilities or obligations of third parties under Environmental Law.

(d)    Seller has provided or otherwise made available to Buyer: (i) any and all environmental reports, studies, audits, records, sampling data, site assessments and other similar documents with respect to the Business or the Purchased Assets or any real property owned, leased or operated by Seller in connection with the Business which are in the possession or control of Seller; and (ii) any and all material documents concerning compliance with Environmental Laws.

**Section 4.17    Taxes.**

(a)    All Tax Returns required to be filed by Seller for any Pre-Closing Tax Period have been filed. Such Tax Returns are true, complete and correct in all material respects. All Taxes due and owing by Seller (whether or not shown on any Tax Return) have been, or will be, paid. No claim has ever been made by an authority in a jurisdiction where Seller does not file Tax Returns that Seller is or may be subject to taxation by that jurisdiction.

(b)    Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, customer, shareholder or other party, and has complied with all information reporting and backup withholding provisions of applicable Law. Each Person providing services to or on behalf of Seller, or in connection with the Business, has been properly classified as an employee or an independent contractor, as applicable, for the purposes of the withholding and payment of Taxes.

(c)    No extensions or waivers of statutes of limitations have been given with respect to any Taxes of Seller.

(d)    All deficiencies asserted, or assessments made, against Seller as a result of any examination by any taxing authority have been fully paid.

(e)    Seller is not a party to any Action by any taxing authority.  There are no pending or threatened Actions by any taxing authority.

(f)    There are no Encumbrances for Taxes upon any of the Purchased Assets nor is any taxing authority in the process of imposing any Encumbrances for Taxes on any of the Purchased Assets (other than for current Taxes not yet due and payable).

**Section 4.18    Brokers.** Other than Seller's obligations to Armory Securities, LLC, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller; provided, however, that Seller may retain and compensate a broker, finder, investment banker, or similar professional in the Bankruptcy Case to market the Purchased Assets as is necessary and appropriate.

**Section 4.19    Product Quality Liability.**

(a)    Except as set forth in **Section 4.19** of the Disclosure Schedules, all of the Inventory complies with it stated specifications and, in all material respects, with all Laws and in accordance with accepted industry standards and practices.  Since January 1, 2015, Seller has not received any material volume of products from vendors that had to be returned or destroyed because they did not comply with Law or accepted industry standards and practices.

(b)    Seller has not received any written citation from any Governmental Authority for violation of any standards with respect to the Products or those portions of the storage, production and other facilities of a material supplier which is involved in, committed to, or have a material effect on the production of the Products.

(c)    Except as set forth in **Section 4.19** of the Disclosure Schedules, Seller does not have any Liability (and there is no pending or threatened Action that alleges any Liability) for replacement of any Products or other damages in connection with any Products, other than ordinary course product

warranty claims consistent with Seller's historical experience, as adjusted for the passage of time based on any changes in the volume and mix of products shipped to customers. Since January 1, 2015, Seller has not recalled any Products, and Seller is not now under any obligation to recall any Products.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Buyer represents and warrants to Seller that the statements contained in this **Article 5** are true and correct as of the date hereof.

**Section 5.1     Organization of Buyer.** Buyer is an entity duly organized, validly existing and in good standing under the Laws of the state of Oregon.

**Section 5.2     Authority of Buyer.** Buyer has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution, and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms. When each other Transaction Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution, and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms.

**Section 5.3     No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the articles of incorporation, bylaws or other organizational documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under any Contract to which Buyer or any Affiliate thereof is a party. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 5.4     Brokers.** No broker, finder or investment banker is entitled to any brokerage, finders or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**Section 5.5     Legal Proceedings.** There are no actions, suits, claims, investigations or other legal Action pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

## ARTICLE 6
## COVENANTS

**Section 6.1    Conduct of Business Prior to the Closing Date.** From the Effective Date until Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Seller shall (i) conduct the Business in the ordinary course of business and consistent with past practice; (ii) use commercially reasonable efforts to maintain and preserve intact the current Business organization and operations and to preserve the rights, goodwill and relationships of employees, customers, suppliers, distributors, regulators and others having relationships with the Business; (iii) refrain from entering into Contracts, except in the ordinary course of business or leases that are terminable at will; or (iv) make any expenditures for capital improvements in an amount exceeding $5,000.  Seller will not take any action that would cause any of the changes, events or conditions described in **Section 4.6** to occur.  In addition (and without limiting the generality of the foregoing) Seller shall:

(a)    preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets;

(b)    pay the debts, Taxes and other obligations of the Business when due;

(c)    maintain the Purchased Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(d)    continue in full force and effect without modification all insurance policies related to the Purchased Assets, except as required by applicable Law;

(e)    perform all of its obligations under all Assigned Contracts;

(f)    maintain the Books and Records in accordance with past practice;

(g)    comply in all material respects with all Laws applicable to the conduct of the Business or the ownership and use of the Purchased Assets; and

(h)    not take or permit any action that would cause any of the changes, events or conditions described above to occur.

**Section 6.2    Efforts.** The Parties agree to use commercially reasonable efforts to satisfy or cause to be satisfied as soon as practicable their respective obligations hereunder and the conditions precedent to Closing.  Without limiting the generality of the foregoing, each party hereto shall use all commercially reasonable efforts to cause the Closing to occur and shall use all commercially reasonable efforts to make and obtain, and to cooperate in making and obtaining, all consents from third parties, including any Governmental Authority, required, necessary or appropriate to permit the consummation of the transactions, including, for the avoidance of doubt, (a) all consents of counterparties to Assigned Contracts required to be obtained in connection with the assignment and assumption of such contracts and leases and (b) all Permits relating to the Real Property.

**Section 6.3    Due Diligence.**

(a)    From the date that Buyer receives preliminary title reports for each of the Real Property parcels until 60 calendar days thereafter ("**Due Diligence Period**"), Seller shall (a) permit Buyer and its Representatives full and free access to and the right to inspect all of the Real Property, properties,

assets, premises, Books and Records (other than the books and records described in **Section 2.2(b)**), the Contracts, and other documents and data related to the Business and the Purchased Assets, including regarding the Brands and the other Intellectual Property Assets (the "**Due Diligence**"); (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Business as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of Seller to cooperate with Buyer in its investigation of the Business. Without limiting the foregoing, Seller shall permit Buyer and its Representatives to conduct environmental due diligence of the Real Property, including the collecting and analysis of samples of indoor or outdoor air, surface water, groundwater or surface or subsurface soil or other materials on, at, in, under or from the Real Property. Any investigation pursuant to this Section shall be conducted in such manner as not to interfere unreasonably with the conduct of the Business or any other businesses of Seller. No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement.

(b)     Buyer and its Representatives shall have a right to enter upon the Real Property for the purpose of conducting the Due Diligence, provided that in each such instance: (i) it obtains the prior written consent of Seller, which such consent shall not be unreasonably withheld or delayed; and (ii) the date and approximate time period are scheduled with Seller. At the election of Seller, a Representative of Seller shall be present during any entry to Buyer or its Representatives upon the Real Property for purposes of conducting its Due Diligence. Buyer shall take necessary actions to minimize interference with or disruption of the operation of the Business. Buyer shall not cause or permit any mechanic liens, materialmen's liens or other liens to be filed against the Real Property or the Business as a result of its Due Diligence.

(c)     Seller shall deliver to Buyer within 10 business days after the Effective Date a preliminary title report for the Real Property from the Title Company, together with legible and complete copies of all documents relating to title exceptions referred to therein. Buyer may order an ALTA survey of the Real Property. Buyer shall give to Seller, prior to the expiration of the Due Diligence Period, written notice stating which exceptions to title and survey matters shown on the preliminary title report and the survey are disapproved by Buyer (the "**Title Objection Notice**"). Seller shall have 5 business days after receipt of the Title Objection Notice to give Buyer written notice (the "**Title Reply Notice**") stating either: (i) that Seller will remove all disapproved exceptions to title and survey matters, or (ii) that Seller elects not to cause one or more of such title exceptions or survey matters to be removed because of Seller's good faith determination that Seller is unable to do so. If Seller gives no timely Title Reply Notice, Seller shall be deemed to have agreed to remove all matters to which Buyer objected. If Seller gives a timely Title Reply Notice specifying objectionable matters which Seller is unable to remove, Buyer shall have 10 business days after receipt of the Title Reply Notice to give to Seller written notice (the "**Final Notice**") stating that Buyer will proceed with the purchase and take the Property subject to such exceptions and survey matters which Seller listed in the Title Reply Notice as being matters that the Seller is unable to remove, or stating that Buyer is terminating this Agreement. If Buyer shall fail to give Seller a Final Notice within 10 business days, Buyer shall be deemed to have elected to terminate this Agreement. Seller agrees to convey the Real Property to Buyer free and clear of all title exceptions and survey matters except only the Permitted Encumbrances. Notwithstanding anything to the contrary among the foregoing provisions, Seller shall be unconditionally obligated to remove from title (a) any mortgages, deeds of trust, public assessments, statutory liens, judgment liens, or other liens which can be removed by the payment of money, and Seller shall not decline to do so in the Reply Notice, and (b) any encumbrance or lien arising after the giving of the Title Objection Notice.

(d)     If Buyer shall conclude that its review of the Purchased Assets supports the Purchase Price and satisfies its other requirements, Buyer shall give written notice (the "**Contingency Removal Notice**") to Seller prior to the expiration of the Due Diligence Period (as the same may be

extended) of satisfaction or waiver of all contingencies to Buyer's obligation to close the transaction contemplated hereby. If no such notice is given, this Agreement shall automatically terminate, with no further obligations on the part of either party, except as otherwise described in **Section 10.2**. Buyer's decision to proceed shall be at its absolute and sole discretion.

        (e)      In the event during the Due Diligence Period Buyer uncovers issues for which Buyer needs additional time for review and inspection or that Buyer requires to be resolved prior to Closing, or if Buyer is awaiting the delivery of a third party report reasonably required in its diligence activity, the parties agree to extend the Due Diligence Period and Closing, as reasonably necessary, to resolve such issues and receive and respond to such reports to the reasonable satisfaction of Buyer.

        **Section 6.4      Assistance in Respect of Applications for Licenses, Permits, Consents, and Approvals.** Without limiting any other covenant or obligation of Seller hereunder, Seller agrees that it shall use commercially reasonable efforts to provide Buyer with such information and such other assistance as may be reasonably required by Buyer on written notice to Seller, to enable Buyer to obtain any and all consents and Permits as may be necessary or desirable with respect to the transactions herein required from any third-party, Governmental Authority, department, agency or regulator having jurisdiction over Buyer, the Business, or the Purchased Assets, including but not limited to any and all assistance required to enable Buyer to obtain any relevant federal, state, and local licenses or other licenses or Permits required for Buyer to operate the Business after the Closing.

        **Section 6.5      [INTENTIONALLY OMITTED]**

        **Section 6.6      Notice of Certain Events.** From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of:

        (a)      any fact, circumstance, event or action, the existence, occurrence or taking of which (i) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (ii) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct, or (iii) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in **Section 8.1** to be satisfied;

        (b)      any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

        (c)      any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

        (d)      any Actions commenced or threatened against, relating to or involving or otherwise affecting the Business, the Purchased Assets or the Assumed Liabilities that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to **Section 4.14** or that relates to the consummation of the transactions contemplated by this Agreement.

        Buyer's receipt of information pursuant to this **Section 6.6** shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement and shall not be deemed to amend or supplement the Disclosure Schedules.

        **Section 6.7      Supplement to Disclosure Schedules.** From time to time prior to the expiration of Due Diligence, Seller shall have the right (but not the obligation) to supplement or amend the Disclosure Schedules hereto with respect to any matter hereafter arising or of which it becomes aware after the Effective Date (each a "**Schedule Supplement**"). Any disclosure in any such Schedule Supplement shall

not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of the indemnification or termination rights contained in this Agreement, or of determining whether or not the conditions set forth in **Section 8.1(a)** have been satisfied.

Section 6.8    **Employees.**

(a)    Seller shall terminate the employment of its Employees effective as of the Closing Date. Buyer in its sole discretion may offer employment effective on the Closing Date, to some or all Employees, and will discuss with such Employees the Buyer's employee benefit programs. Effective as of Closing, the Employees shall cease active participation in the Benefits. Seller will pay all amounts due its Employees in connection with their employment including compensation, Benefits and applicable Taxes.

(b)    Seller shall be solely responsible, and Buyer shall have no obligations whatsoever for, any compensation or other amounts payable to any current or former employee, officer, manager, independent contractor or consultant of the Business, including hourly pay, commission, bonus, salary, accrued vacation, fringe, profit sharing benefits or severance pay for any period relating to the service with Seller at any time on or prior to the Closing Date and Seller shall pay all such amounts to all entitled persons on or prior to the Closing Date.

(c)    Seller shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident or disability benefits brought by or in respect of current or former employees, officers, directors, independent contractors or consultants of the Business or the spouses, dependents or beneficiaries thereof, which claims relate to events occurring on or prior to the Closing Date. Seller also shall remain solely responsible for all worker's compensation claims of any current or former employees, officers, directors, independent contractors or consultants of the Business which relate to events occurring on or prior to the Closing Date. Seller shall pay, or cause to be paid, all such amounts to the appropriate persons as and when due.

Section 6.9    **Title Insurance.** At Closing, Seller will cause the Title Company to provide Buyer with extended ALTA form owner's title insurance policies for the Real Property ("**ALTA Extended Form Title Insurance Policies**") with coverage amounts equal to the value allocated to the Real Property in Exhibit A.

Section 6.10    **Confidentiality.**

(a)    Except as required by the Bankruptcy Court or the Bankruptcy Code, Seller shall cause its Affiliates to, hold, and shall use its commercially reasonable efforts to cause its respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business under the Brands, except with respect to such information that (i) is generally available to and known by the public through no fault of Seller, any of its Affiliates or their respective Representatives; or (ii) is lawfully acquired by Seller or any of its Affiliates or Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation, provided that (A) Seller and its Affiliates may disclose on a confidential basis certain summary financial information relating to the transactions contemplated by this Agreement to any professional advisor who is bound prior to disclosure to maintain the confidentiality of such information, and (B) Seller and its Affiliates may disclose information otherwise necessary in order to enforce the terms of this Agreement or defend against any claim made under this Agreement. If Seller or any of its Affiliates or their Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, Seller shall, to the extent legally permissible, promptly notify Buyer in writing and shall disclose only that portion of such information which Seller is advised by its counsel in writing is legally required to be disclosed, *provided that* Seller shall use commercially reasonable efforts to obtain an

appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

(b)     Except as required by the Bankruptcy Court or the Bankruptcy Code, Buyer shall, and shall cause each of its Affiliates to, hold, and shall use its commercially reasonable efforts to cause its or their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the business of Seller and its Affiliates (other than the Business or the Purchased Assets), except with respect to information that (i) is generally available to and known by the public through no fault of Buyer, any of its Affiliates or their respective Representatives; or (ii) is lawfully acquired by Buyer, any of its respective Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation, provided that (A) Buyer and its Affiliates may disclose information to the extent required by applicable law, and may also disclose on a confidential basis certain summary financial information relating to the transactions contemplated by this Agreement to any professional advisor who is obligated prior to disclosure to maintain the confidentiality of such information, and (B) Buyer and its Affiliates may disclose information otherwise necessary in order to enforce the terms of this Agreement or the Transaction Documents, or defend against any claim made under this Agreement or the other Transaction Documents. If Buyer or any of its Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, to the extent legally permissible, Buyer shall promptly notify Seller in writing and shall disclose only that portion of such information which Buyer is advised by its counsel in writing is legally required to be disclosed, *provided that* Buyer shall use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 6.11     Public Announcements.**  Until and after Closing, unless otherwise required by the Bankruptcy Court or applicable Law, no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media, and the parties shall mutually agree as to the timing and contents of any such announcement.

**Section 6.12     Books and Records.**  For a period of three (3) years after Closing, Seller and Buyer shall (i) retain the Books and Records (including personnel files, if any) relating to periods prior to Closing; and (ii) upon reasonable notice, afford the other party reasonable access (including the right to make photocopies), during normal business hours, to such Books and Records.

**Section 6.13     Accounts Receivable.**  In the event Seller receives payment of a receivable to which it is not entitled per this Agreement, Seller shall deliver to Buyer any and all such payments.

**Section 6.14     Insurance.**  Seller shall keep all insurance coverage in place through the Closing Date.  In addition, prior to the Closing, Seller shall promptly inform the insurers under any insurance policy held by Seller of any facts, circumstances or events, to the Knowledge of Seller, that would reasonably be expected to result in a claim against Seller or the Purchased Assets that would be covered by such insurance policy.

**Section 6.15     Transfer Taxes.**  All transfer, documentary, sales, use, stamp, registration, value-added, Taxes, if any, due on sale of the Real Property and its  real estate improvements, and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary). Seller shall pay 50% of the costs to record the Deeds and any other assignments or instruments to be recorded with the real estate records in connection with the sale or

conveyance of the Purchased Assets[1].

**Section 6.16    Further Assurances.**  Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

## ARTICLE 7
## BANKRUPTCY MATTERS

**Section 7.1    Court Approval.**  Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval. Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court, and (b) Seller must pay any amount needed to cure all defaults and provide adequate assurance of future performance under the Assigned Contracts which are to be listed by Seller on Schedule 2.1(e) (the "**Cure Costs**").. Seller and Buyer acknowledge that in connection with Seller's efforts to obtain the highest or otherwise best offer possible for the Purchased Assets, Seller may engage a financial advisor, and will prepare or cause to be prepared an executive summary of the Business, and will actively market the sale of the Business. Further, the Seller and Buyer acknowledge that the Bankruptcy Court will require a marketing and auction process for the sale of the Purchased Assets, and that Seller may retain a broker, finder, investment banker, or similar professional to represent Seller in such process.

**Section 7.2    Sale Motion.**  Seller has filed or will within five (5) business days file with the Bankruptcy Court a motion (the "**Sale Motion**"), notices and proposed orders, in form and content reasonably satisfactory to Buyer seeking the Bankruptcy Court's issuance of the sale order (the "**Sale Order**"). The Sale Motion shall include a request that the Sale Order include, among other things:

(a)    that this Agreement was negotiated at arms-length, and the Buyer has acted in good faith and without collusion or fraud of any kind;

(b)    the Buyer is not an "insider" or "affiliate" of the Seller as those terms are defined in the Bankruptcy Code;

(c)    neither the Seller nor the Buyer has engaged in any conduct that would prevent the application of Section 363(m) of the Bankruptcy Code or cause the application of Section 363(n) of the Bankruptcy Code with respect to the consummation of the purchase transaction;

(d)    Buyer is purchasing the Purchased Assets in good faith within the meaning of Section 363(m) of the Bankruptcy Code and is entitled to the protections afforded by Section 363(m) of the Bankruptcy Code;

(e)    notice of the sale (and any required sale procedures), as sent to all creditors and interested parties, is sufficient to comply with notice requirements of the Bankruptcy Code;

(f)     all objections to the sale free and clear of liens, claims, interests and encumbrances have been withdrawn or overruled, and the Buyer therefore purchases the Purchased Assets free and clear of all liens, claims, interests and encumbrances, including free and clear of Liens or Liabilities, other than Permitted Encumbrances and Assumed Liabilities; and

(g)     Buyer is released from any potential liability in connection with the purchase of the Purchased Assets, other than Permitted Encumbrances and Assumed Liabilities.

**Section 7.3     Service of Sale Motion.**  Seller shall serve a copy of the Sale Motion on:

(a)     all entities that claim any interest in or Lien (other than Permitted Encumbrances) upon the Purchased Assets;

(b)     all parties to Assigned Contracts;

(c)     all governmental taxing authorities that have or as a result of the sale of the Purchased Assets may have claims, contingent or otherwise, against the Seller;

(d)     all parties that filed notices of appearance or requests for notices under Bankruptcy Rule 9010(b), or were entitled to notice under Bankruptcy Rule 2002;

(e)     all creditors or holders of claims (as defined in Section 101(5) of the Bankruptcy Code, whether or not liquidated, contingent, disputed, or unmatured) of the Seller;

(f)     all interested governmental, pension, environmental and other regulatory entities;

(g)     the Attorney General of the State of Oregon;

(h)     the Office of the United States Trustee;

(i)     the Internal Revenue Service and any governmental taxing authority that has filed a claim against the Seller; and

(j)     all entities that expressed to the Seller an interest in purchasing the Purchased Assets.

**Section 7.4     Comment by Buyer.**  Seller shall provide Buyer with copies of all motions, applications and supporting papers prepared by or on behalf of the Seller (including forms of orders) directly relating to the Purchased Assets or this Agreement prior to the filing thereof in the Bankruptcy Case so as to allow Buyer to provide reasonable comments for incorporation into same.

**Section 7.5     Stalking Horse Provisions.**  The Seller has filed or will within 5 business days file with the Bankruptcy Court a motion seeking approval of a bidding process. The Bankruptcy Court order approving such bidding process shall include the following, without limitation:

(a)     If Buyer is not, for any reason other than as a result of Buyer breaching this Agreement, the successful purchaser, Buyer will be entitled to a cash payment in an amount equal to the sum of all reasonable costs and expenses of Buyer incurred in connection with Buyer's efforts to negotiate and consummate the Transactions contemplated by this Agreement (including, without limitation, the fees and expenses of counsel), but such reimbursement shall be capped at $250,000 (the "**Expense Reimbursement**") and a return of any deposit made by Buyer;

(b)     The Expense Reimbursement shall be paid from any proceeds of an Alternative Transaction, otherwise payable to Sellers, provided that if such amounts are not paid from such proceeds, Sellers and the Active Members shall remain liable for such amounts.  Sellers shall have no liability with respect to Buyer or any other person for an amount exceeding the Expense Reimbursement in the event that this Agreement is terminated by Seller pursuant to **Section 10.1(g)**.

(c)     The Expense Reimbursement (to the extent due and owing) shall be first-priority administrative expenses of Seller's bankruptcy estate under Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

(d)     The obligation of Seller to pay, and the payment by Seller of, the Expense Reimbursement (to the extent due and owing), shall in no way limit or otherwise affect the rights of Buyer to a return of any deposit made in connection with this Agreement or the Transactions.

(e)     Seller acknowledges and agrees that Buyer would not have entered into this Agreement but for the provisions in this **Section 7.5**, and that the provisions of this **Section 7.5** are integral to, and shall survive any termination of, this Agreement.

(f)     Competing bidders will be required to pay the Expense Reimbursement and overbid in $100,000.00 increments above the bid submitted by the Buyer; Buyer shall have the right but not the obligation to overbid competing bids in $100,000.00 increments;

(g)     Competing bidders must demonstrate when bidding the ability to pay the purchase price in cash at the Closing;

(h)     Competing bidders (other than the Buyer) will be required to deposit $500,000.00 cash, and deliver to Seller a signed copy of this Agreement, marked to show such bidder's proposed changes, in order to confirm a commitment to proceed with the purchase; and

(i)     If the Buyer is the successful purchaser, then the Sale Order shall contain, among other things, the provisions set forth above in **Section 7.2**.

## ARTICLE 8
## CONDITIONS TO CLOSING

**Section 8.1     Conditions to Obligations of Buyer.**  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to Closing, of each of the following conditions:

(a)     The Bankruptcy Court shall have entered an order approving the bidding procedures pursuant to which Seller shall sell the Purchased Assets to Buyer or a higher and better bidder (the "**Bid Procedures Order**") in a form reasonably acceptable to the Parties and otherwise substantially in the form set forth on Exhibit F;

(b)     The Seller shall have filed the Sale Motion under Sections 363 and 365 of the Bankruptcy Code seeking approval of (1) the sale of the Purchased Assets and assumption and assignment of the Assigned Contracts and assumption of the Assumed Liabilities pursuant to the terms and the Transactions contemplated by this Agreement; (2) the sale of the Purchased Assets to the Buyer free and clear of liens, claims and interests, to the fullest extent possible under Section 363(f) of the Bankruptcy Code; and (3) the form of this Agreement;

(c)     The Bankruptcy Court shall have entered the Sale Order in a form approved by the Parties, which Sale Order shall include a finding that Buyer has purchased the Assets in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; and the Sale Order shall not be stayed, shall be in full force and effect and shall not have been vacated or reversed by order of the Bankruptcy Court or any other Court;

(d)     No court order by the Bankruptcy Court shall have been entered in any action or proceeding instituted by any person that enjoins, restrains, or prohibits the consummation of the transactions contemplated by this Agreement

(e)     The representations and warranties of Seller contained in this Agreement, the other Transaction Documents, and any certificate or other writing delivered pursuant to this Agreement, shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date).

(f)     Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(g)     No action, suit, or proceeding shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling or charge would (i) prevent consummation of any of the transactions contemplated by this Agreement, (ii) cause any of the transactions contemplated by this Agreement to be rescinded following consummation, (iii) affect adversely and materially the right of Buyer to own all of the Purchased Assets, (iv) affect adversely and materially the right of Seller to own Seller's assets and to operate its business, or (v) prevent the Closing; and no such injunction, judgment, order, decree, ruling, or charge shall be in effect.

(h)     Buyer shall have received from Seller duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in **Section 3.2(a)**.

(i)     From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(j)     Buyer shall have received all Permits that are necessary for it to conduct the Business as conducted by Seller as of the Closing Date.

(k)     All approvals, consents and waivers that are required, including those listed on **Section 4.3** of the Disclosure Schedules, shall have been received, and executed counterparts thereof shall have been delivered to Buyer at or prior to the Closing.

(l)     Buyer shall have received from Seller a certificate, dated the Closing Date and signed by the secretary of Seller, that each of the conditions set forth in **Section 8.1(a)** and **Section 8.1(f)** have been satisfied ("**Seller's Closing Certificate**").

(m)     Buyer shall have received a certificate of the Secretary of Seller certifying that attached thereto are true and complete copies of all resolutions adopted by the board of managers and members of Seller, as applicable, authorizing the execution, delivery and performance of this Agreement

and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby ("**Seller's Secretary Certificate**").

(n)     Buyer shall have received from Seller a certificate pursuant to Treasury Regulations Section 1.1445-2(b) (the "**FIRPTA Certificate**") that Seller is not a foreign person within the meaning of Section 1445 of the Code duly executed by Seller.

(o)     The Title Company is prepared to issue an ALTA Extended Form Title Insurance Policy with endorsements for each parcel of Real Property in the amount of the Purchase Price allocated to the applicable parcel of Real Property, insuring marketable fee simple title to each parcel of Real Property in Buyer upon recording of the Deed, subject only to the Permitted Encumbrances and no other matters.

(p)     All Encumbrances relating to the Purchased Assets shall have been released in full, other than Permitted Encumbrances, and Seller shall have delivered to Buyer written evidence, in form satisfactory to Buyer in its sole discretion, of the release of such Encumbrances.

(q)     Seller shall have completed all reasonable distributor termination or re-alignment actions requested by Buyer, provided such actions do not result in any liability to material cost to Seller.

(r)     Seller shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

(s)     On or prior to the Closing Date, the Key Employees shall have accepted employment with Purchaser on terms and conditions satisfactory to Buyer; and

(t)     Buyer shall have delivered to Seller the Contingency Removal Notice.

**Section 8.2     Conditions to Obligations of Seller .** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to Closing, of each of the following conditions:

(a)     The representations and warranties of Buyer contained in in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant to this Agreement shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date).

(b)     Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     Buyer shall have delivered the Closing Cash Payment and such other documents and deliveries set forth in **Section 3.2(b)**.

(d)     Seller shall have received from Buyer a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in **Section 8.2(a)** and **Section 8.2(b)** have been satisfied ("**Buyer's Closing Certificate**").

(e)     Seller shall have received a certificate of the Secretary of Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors and shareholders of Buyer, as applicable, authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby ("**Buyer's Secretary Certificate**").

(f)     Buyer shall have delivered to Seller such other documents or instruments as Seller reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

(g)     Buyer shall have delivered to Seller a fully-executed copy of the Grant Agreement with Old Cosmos HoldCo.

## ARTICLE 9
## INDEMNIFICATION

**Section 9.1      Survival.** Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is eighteen (18) months from the Closing Date; *provided, that* the representations and warranties in (i) **Section 4.1** *(Organization and Qualification of Seller)*, **Section 4.2** *(Authority of Seller)*, **Section 4.8** *(Title to Purchased Assets)*, **Section 4.18** *(Brokers)*, **Section 5.1** *(Organization of Buyer)*, **Section 5.2** *(Authority of Buyer)* and **Section 5.4** *(Brokers)* shall survive indefinitely, and (ii) **Section 4.16** *(Environmental Matters)* and **Section 4.17** *(Taxes)* shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof).   All covenants and agreements of the parties that by their terms contemplate performance after Closing shall survive indefinitely or for the period explicitly specified therein.

**Section 9.2      Indemnification By Seller .** Subject to the other terms and conditions of this **Article 9**, from and after Closing, Seller shall indemnify and defend each of Buyer, its Affiliates and their respective directors, officers, managers, shareholders, members, partners, employees, agents, Representatives, successors and permitted assigns (collectively, the "**Buyer Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, Buyer Indemnitees based upon, arising out of, with respect to or by reason of:

(a)     any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement or the other Transaction Documents or in any certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller or their Affiliates pursuant to this Agreement, or the other Transaction Documents or any certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement;

(c)     any Excluded Asset or any Excluded Liability;

(d)        the ownership or operation of the Purchased Assets and the Business prior to Closing; or

(e)        any Tax or Taxes with respect to the Purchased Assets or operations of the Business which is due, or which will become due, for any period prior to Closing.

**Section 9.3        Indemnification By Active Members.** Subject to the other terms and conditions of this Article 9, from and after Closing, the Active Members shall, jointly and severally, indemnify and defend the Buyer Indemnitees against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, Buyer Indemnitees based upon, arising out of, with respect to or by reason of:

(a)        any inaccuracy in or breach of any of the representations or warranties of Seller contained in **Section 4.3** (*No Conflicts; Consents*), **Section 4.4** ("*Financial Statements*") **Section 4.6** ("*Absence of Certain Changes, Events and Conditions*"), **Section 4.7** ("*Assigned Contracts*"), **Section 4.9** ("*Condition of Assets*"), **Section 4.10** ("*Real Property*"), **Section 4.11** ("*Intellectual Property*"), **Section 4.12** ("*Inventory*"), **Section 4.13** ("*Insurance*"), **Section 4.14** ("*Legal Proceedings, Governmental Orders*"), **Section 4.15** ("*Compliance with Laws; Permits*"), **Section 4.16** ("*Environmental Matters*"), **Section 4.17** ("*Taxes*"), **Section 4.18** ("*Brokers*"), and **Section 4.19** ("*Product Quality Liability*") of this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)        any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller or their Affiliates pursuant to **Section 6.1**("*Conduct of Business Prior to the Closing Date*"), **Section 6.2** ("*Efforts*"), **Section 6.4** ("*Assistance in Respect of Applications for Licenses, Permits, Consents, and Approvals*"), **Section 6.10** ("*Confidentiality*"), **Section 6.11** ("*Public Annoucements*"), **Section 6.12** ("*Books and Records*"), **Section 6.14** ("*Insurance*"), **Section 6.15** ("*Transfer Taxes*"), and **Section 7.5** ("*Stalking Horse Provision*") of this Agreement;

(c)        any Excluded Asset or any Excluded Liability;

(d)        any Encumbrances, other than the Permitted Encumbrances;

(e)        the ownership or operation of the Purchased Assets and the Business prior to Closing; or

(f)        any Tax or Taxes with respect to the Purchased Assets or operations of the Business which is due, or which will become due, for any period prior to Closing.

**Section 9.4        Indemnification By Buyer.** Subject to the other terms and conditions of this **Article 9**, from and after Closing, Buyer shall indemnify and defend Seller, its Affiliates and directors, officers, managers, shareholders, members, partners, employees, agents, Representatives, successors and permitted assigns (collectively, the "**Seller Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, Seller Indemnitees based upon, arising out of, with respect to or by reason of:

(a)        any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement, the other Transaction Documents or in any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement, as of the date such representation or warranty was

made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)      any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement, the other Transaction Documents or any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement;

(c)      any Assumed Liability;

(d)      ownership or operation of the Purchased Assets and the Business as of and after Closing; or

(e)      any Tax or Taxes with respect to the Purchased Assets which is due, or which will become due, for any period on and after Closing.

**Section 9.5    Certain Limitations.** The indemnification provided for in **Section 9.2** shall be subject to the following limitations:

(a)      Seller shall not be liable to Buyer Indemnitees for indemnification under **Section 9.2(a)** until the aggregate amount of all Losses in respect of indemnification under **Section 9.2(a)** exceeds $50,000 (the "**Basket**"), in which event Seller shall be required to pay or be liable for all such Losses from the first dollar.

(b)      The maximum aggregate amount of indemnifiable Losses that may be recovered from the Seller pursuant to **Section 9.2(a)** shall not exceed the Purchase Price (such aggregate amount being the "**Cap**").

(c)      Notwithstanding **Section 9.5(a)** and **Section 9.5(b)**, the Basket and the Cap shall not apply to Losses based upon, arising out of, with respect to or by reason of fraud, intentional misconduct, or by reason of any inaccuracy in or breach of the Fundamental Representations; provided, however, that in no event shall the aggregate liability of Seller pursuant to **Section 9.2(a)** exceed an amount equal to the cash Purchase Price, other than in the event of fraud, intentional misconduct, or a breach of the representations and warranties set forth in **Section 4.1**, **Section 4.2**, or **Section 4.8**.

(d)      In calculating amounts payable to an Indemnified Party hereunder, the amount of any indemnified Loss shall be determined without duplication of such Loss for which an indemnification claim has already been made under any other representation, warranty, covenant or agreement.

(e)      For purposes of this **Article 9**, any inaccuracy in or breach of any representation or warranty shall be determined without regard to any materiality, Material Adverse Effect or other similar materiality qualification contained in or otherwise applicable to such representation or warranty. In determining the amount of any Loss for purposes of this Agreement, any materiality qualifier contained in a representation, warranty, covenant or certificate shall be disregarded.

(f)      Buyer's right to assert any remedies hereunder based on the representations, warranties, covenants and agreements of Seller contained herein will not be affected or deemed waived by reason of any investigation conducted by Buyer and its Affiliates (or their agents or representatives) or by reason of the fact that Buyer and/or its Affiliates (or their agents or representatives) knew or should have known that such representation or warranty, is, was or might be inaccurate, or such covenant or agreement is, was or might be breached or by reason of Buyer's waiver of any condition set forth in **Section 3.2(a)**.

**Section 9.6**      **Indemnification Procedures.** The party making a claim under this **Article 9** is referred to as the "**Indemnified Party**," and the party against whom such claims are asserted under this **Article 9** is referred to as the "**Indemnifying Party**."

        (a)      <u>Third Party Claims</u>. If any Indemnified Party receives notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "**Third Party Claim**") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty (30) calendar days after receipt of such notice of such Third Party Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure or is otherwise materially prejudiced by such failure. Such notice by the Indemnified Party shall describe the Third Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party shall cooperate in good faith in such defense; *provided, that* if the Indemnifying Party is Seller, such Indemnifying Party shall not have the right to defend or direct the defense of any such Third Party Claim that (x) is asserted directly by or on behalf of a Person that is a then current supplier or customer of the Business, or (y) seeks an injunction or other equitable relief against the Indemnified Party. In the event that the Indemnifying Party assumes the defense of any Third Party Claim, subject to **Section 9.6(b)**, it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party shall have the right to participate in the defense of any Third Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. The fees and disbursements of such counsel shall be at the expense of the Indemnified Party, *provided, that* if in the reasonable opinion of counsel to the Indemnified Party, (A) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party; or (B) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived, the Indemnifying Party shall be liable for the reasonable fees and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required. If the Indemnifying Party elects not to compromise or defend such Third Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, or fails to diligently prosecute the defense of such Third Party Claim, the Indemnified Party may, subject to **Section 9.6(b)**, pay, compromise, defend such Third Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third Party Claim. Seller and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including making available records relating to such Third Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

        (b)      <u>Settlement of Third Party Claims</u>. Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into a settlement of any Third Party Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed), except as provided in this **Section 9.6(b)**. If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third Party Claim and the Indemnifying Party desires to

accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten (10) days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third Party Claim and in such event, the maximum liability of the Indemnifying Party as to such Third Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third Party Claim, the Indemnifying Party may settle the Third Party Claim upon the terms set forth in such firm offer to settle such Third Party Claim. If the Indemnified Party has assumed the defense pursuant to **Section 9.6(a)**, it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

(c)     Direct Claims. Any Action by an Indemnified Party on account of a Loss which does not result from a Third Party Claim (a "**Direct Claim**") shall be asserted by the Indemnified Party giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty (30) days after the Indemnified Party becomes aware of such Direct Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure or is otherwise materially prejudiced by such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have thirty (30) days after its receipt of such notice to respond in writing to such Direct Claim. The Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Indemnified Party's premises and personnel during normal business hours and the right to examine and copy any relevant accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such thirty (30) day period, the Indemnifying Party shall be deemed to have accepted such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

**Section 9.7     Payments.**     Once a Loss is agreed to by the Indemnifying Party or finally adjudicated to be payable pursuant to this **Article 9**, the Indemnifying Party shall satisfy its obligations within 10 Business Days of such final, non-appealable adjudication by wire transfer of immediately available funds.

**Section 9.8     Tax Treatment of Indemnification Payments.** All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes unless otherwise required by Law.

**Section 9.9     Exclusive Remedies.** The parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims (other than claims arising from fraud, criminal activity, intentional misrepresentation or willful misconduct on the part of a party hereto in connection with the transactions contemplated by this Agreement) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this **Article 9**. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates and each of their respective Representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this **Article 9**. Nothing in this **Section 9.9**

shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled or to seek any remedy on account of any party's fraudulent, criminal or intentional misconduct.

Section 9.10   Mitigation.  Each Indemnified Party shall make commercially reasonable efforts to mitigate any Losses that an Indemnified Party asserts under this **Article 9** after any executive officer of such Party becoming actually aware of the event or condition that gave rise to such Losses that are indemnifiable hereunder.

<div align="center">

**ARTICLE 10**
**TERMINATION**

</div>

Section 10.1   Termination. This Agreement may be terminated at any time prior to Closing:

(a)   by the mutual written consent of the Parties;

(b)   automatically if Buyer fails to provide the Contingency Removal Notice by the expiration of the Due Diligence Period as set forth in **Section 6.3(d)**;

(c)   automatically if Buyer fails to provide the Final Notice as set forth in **Section 6.3(c)**;

(d)   by Buyer by written notice to Seller if Buyer is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Section 7.1** and such breach, inaccuracy or failure has not been cured by Seller within 10 days of Seller's receipt of written notice of Buyer's intention to terminate setting forth in reasonable detail the grounds for such termination;

(e)   by Seller by written notice to Buyer if Seller is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Section 8.2** and such breach, inaccuracy or failure has not been cured by Buyer within 10 days of Buyer's receipt of written notice of Seller's intention to terminate setting forth in reasonable detail the grounds for such termination; or

(f)   by Buyer if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(g)   by Buyer, if (i) the Sale Order shall not have been entered by the Bankruptcy Court by the close of business on October 11, 2019; or (ii) the Sale Order has been appealed, withdrawn, revoked, rescinded, modified or amended in any material respect without the prior written consent of the Parties;

(h)   by Seller, if Buyer fails to satisfy any of its material obligations at Closing; or

(i)   by Buyer or Seller in the event that there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited.

Section 10.2   Effect of Termination. In the event of the termination of this Agreement in accordance with this **Article 10**, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a)    this **Article 10**, **Section 6.10, Section 6.11, and Section 7.5** hereof shall survive termination;

(b)    that nothing herein shall relieve any party hereto from liability for any intentional breach of any provision hereof;

(c)    nothing herein shall relieve Seller of the Stalking Horse Provisions set forth in **Section 7.5**; and

(d)    Seller shall pay Title Company for any costs incurred in obtaining preliminary title reports for the Real Property.

## ARTICLE 11
## MISCELLANEOUS

**Section 11.1    Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors, and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 11.2    Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 11.2**):

|  |  |
|---|---|
| If to Seller: | 4 Him Food Group, LLC |
| | 395 East 1st Avenue |
| | Junction City, Oregon 97448 |
| | E-mail: JohnS@cosmoscreations.com |
| | Attention: Mr. John P. Strasheim |
| | |
| with a copy to: | Leonard Law Group LLC |
| | 1 SW Columbia, Ste. 1010 |
| | Portland, OR 97258 |
| | E-mail: tsolomon@LLG-LLC.com |
| | Attention: Timothy A. Solomon |
| | |
| If to Buyer: | Juanita's Snacks, LLC |
| | 2885 Van Horn Drive |
| | Hood River, OR 97031 |
| | E-mail: luis@juanitasfinefoods.com |
| | Attention: Luis B. Dominguez |

| with a copy to: | Davis Wright Tremaine LLP |
|---|---|
| | 1300 SW Fifth Avenue, Suite 2400 |
| | Portland, OR 97201 |
| | E-mail: jesselyon@dwt.com |
| | Attention: Jesse D. Lyon |
| | |
| and an additional copy to: | Motschenbacher & Blattner LLP |
| | 117 SW Taylor Street, Suite 300 |
| | Portland, OR 97204 |
| | E-mail: nhenderson@portlaw.com |
| | Attention: Nicholas J. Henderson |

**Section 11.3     Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 11.4     Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 11.5     Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 11.6     Entire Agreement.** This Agreement, including the Disclosure Schedules, and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 11.7     Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed; provided, however, that the Buyer may assign its interest in

this Agreement (or a portion of its interest in this Agreement with respect to certain identified portions of the Purchased Assets) to one or more affiliates of Buyer which are controlled by or under common control with the Buyer.  No assignment shall relieve the assigning party of any of its obligations hereunder.

Section 11.8    **No Third-party Beneficiaries.** Except as provided in **Article 9**, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 11.9    **Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 11.10    **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of Oregon without giving effect to any choice or conflict of law provision or rule (whether of the State of Oregon or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Oregon.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF OREGON, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING

WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS **SECTION 10.10(c)**.

      **Section 11.11    Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

      **Section 11.12    Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

SELLER:

**4 HIM FOOD GROUP, LLC,**
an Oregon limited liability company

By: _____

Name: John Strasheim
Title: Chief Executive Officer

**BUYER:**

**JUANITA'S SNACKS, LLC,**
an Oregon limited liability company

By
Name: Luis B. Dominguez
Title: President

**EXHIBIT A**
**Page 41 of 59**

## ANNEX A

## DEFINITIONS

"**Action**" means any (i) claim, action, cause of action, demand, lawsuit, audit, investigation of which a Party has written notice, proceeding, litigation, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity, before a Governmental Authority or (ii) binding arbitration of competent jurisdiction.

"**Active Members**" means John Paul Strasheim and Jerid Strasheim.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the Preamble.

"**Allocation Schedule**" has the meaning set forth in **Section 2.7**.

"**ALTA Extended Form Title Insurance Policies**" has the meaning set forth in **Section 6.9**.

"**Assigned Contracts**" has the meaning set forth in **Section 2.1(e)**.

"**Assignment and Assumption Agreement**" has the meaning set forth in **Section 3.2(a)(iii)**.

"**Assumed Liabilities**" has the meaning set forth in **Section 2.3**.

"**Balance Sheet**" has the meaning set forth in **Section 4.4**.

"**Balance Sheet Date**" has the meaning set forth in **Section 4.4**.

"**Basket**" has the meaning set forth in **Section 9.5(a)**.

"**Bill of Sale**" has the meaning set forth in **Section 3.2(a)(i)**.

"**Books and Records**" has the meaning set forth in **Section 2.1(l)**.

"**Brands**" has the meaning set forth in Recitals.

"**Business**" has the meaning set forth in the Recitals.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Portland, Oregon are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the Preamble.

"**Buyer Indemnitees**" has the meaning set forth in **Section 9.2**.

"**Buyer Promissory Notes**" means (i) that certain secured promissory note, dated March 29, 2019, by Seller in favor of Buyer; (ii) that certain secured promissory note, dated April 15, 2019, by Seller in

favor of Buyer; and (iii) that certain secured promissory note, dated May 30, 2019, by Seller in favor of Buyer.

"**Buyer's Closing Certificate**" has the meaning set forth in **Section 8.2(d)**.

"**Buyer's Secretary Certificate**" has the meaning set forth in **Section 8.2(e)**.

"**Cap**" has the meaning set forth in **Section 9.5(b)**.

"**Closing**" has the meaning set forth in **Section 3.1**.

"**Closing Date**" has the meaning set forth in **Section 3.1**.

"**Closing Payment**" has the meaning set forth in **Section 2.5(d)**.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contingency Removal Notice**" has the meaning set forth in **Section 6.3(d)**.

"**Contracts**" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"**Deed**" has the meaning set forth in **Section 3.2(a)(ii)**.

"**Direct Claim**" has the meaning set forth in **Section 9.6(c)**.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller and Buyer concurrently with the execution and delivery of this Agreement.

"**Dollars or $**" means the lawful currency of the United States.

"**Due Diligence**" has the meaning set forth in **Section 6.3(a)**.

"**Due Diligence Period**" has the meaning set forth in **Section 6.3(a)**.

"**Effective Date**" has the meaning set forth in the Preamble.

"**Encumbrance**" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**Environmental Claim**" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials;

or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Law**" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): CERCLA; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**Environmental Notice**" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"**Environmental Permit**" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**Equipment**" has the meaning set forth in **Section 2.1(c)**.

"**Estimated Adjustment**" has the meaning set forth in **Section 2.5(b)**.

"**Excluded Assets**" has the meaning set forth in **Section 2.2**.

"**Excluded Contracts**" has the meaning set forth in **Section 2.2(a)**.

"**Excluded Liabilities**" has the meaning set forth in **Section 2.4**.

"**FDA**" has the meaning set forth in **Section 4.15(a)**.

"**Final Notice**" has the meaning set forth in **Section 6.3(c)**.

"**Financial Statements**" has the meaning set forth in **Section 4.4**.

"**FIRPTA Certificate**" has the meaning set forth in **Section 8.1(n)**.

"**Fundamental Representations**" means the representations and warranties set forth in **Section 4.1**, **Section 4.2**, **Section 4.8**, **Section 4.17**, and **Section 4.18**.

"**GAAP**" means the United States generally accepted accounting principles in effect from time to time, consistently applied.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Grant Agreement**" means that agreement granting Old Cosmos HoldCo the Juanita's Snacks Economic Interest.

"**Hazardous Materials**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"**Indemnified Party**" has the meaning set forth in **Section 9.6**.

"**Indemnifying Party**" has the meaning set forth in **Section 9.6**.

"**Intellectual Property**" means all intellectual property rights, however arising, pursuant to the Laws of any jurisdiction throughout the world, whether registered or unregistered, including any and all: (a) trademarks, service marks, trade names, brand names, logos, trade dress, design rights and other similar designations of source, sponsorship, association or origin, including label designs, bottle designs, and other designs, advertising campaigns and layouts, together with the goodwill connected with the use of and symbolized by, and all registrations, applications and renewals for, any of the foregoing; (b) internet domain names, whether or not trademarks, registered in any top-level domain by any authorized private registrar or Governmental Authority, web addresses, web pages, websites and related content, accounts with Twitter, Facebook and other social media companies and Seller's content found thereon and related thereto, and URLs; (c) works of authorship, expressions, designs and design registrations, whether or not copyrightable, including copyrights, author, performer, moral rights, and all registrations, applications for registration and renewals of such copyrights; (d) inventions, discoveries, trade secrets, business and technical information and know-how, databases, data collections, formulae, recipes, blending instructions, including any works in progress, and other confidential and proprietary information and all rights therein; (e) patents (including all reissues, divisionals, provisionals, continuations and continuations-in-part, re-examinations, renewals, substitutions and extensions thereof), patent applications, and other patent rights and any other Governmental Authority-issued indicia of invention ownership (including inventor's certificates, petty patents and patent utility models); (f) software and firmware, including data files, source code, object code, application programming interfaces, architecture, files, records, schematics, computerized databases and other related specifications and documentation; (g) royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; (h) telephone and facsimile numbers, and (i) all rights to any Actions of any nature available to or being pursued by Seller to the extent related to the foregoing, whether accruing before, on or after the date hereof, including all rights to and claims for damages, restitution and injunctive relief for infringement, dilution, misappropriation, violation, misuse, breach or default, with the right but no obligation to sue for such legal and equitable relief, and to collect, or otherwise recover, any such damages.

"**Intellectual Property Agreements**" means all material licenses, sublicenses and other agreements by or through which other Persons, including Seller's Affiliates, grant Seller exclusive or non-exclusive rights or interests in or to any Intellectual Property used primarily in connection with the Business, excluding off-the-shelf software licenses.

"**Intellectual Property Assets**" means: (a) the Brands; (b) all other Intellectual Property used in connection with the Brands; and (c) all documentation, materials, and works of authorship relating to the Products and the Business, including marketing collateral and the like; in each case including all Intellectual Property rights therein and thereto, and all associated goodwill.

"**Intellectual Property Assignment**" has the meaning set forth in **Section 3.2(a)(iv)**.

"**Intellectual Property Registrations**" means all Intellectual Property Assets that are subject to any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered trademarks, domain names and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"**Inventory**" has the meaning set forth in **Section 2.1(d)**.

"**Juanita's Snacks Economic Interest**" means a non-assignable, 20% economic interest in Buyer, which economic interest is non-voting, economic rights only, and subject to the terms and conditions set forth in the Grant Agreement.

"**Key Employees**" means those employees of the Seller designated by Buyer and as listed on Schedule 8.1(s), which may be amended from time to time prior to the Closing Date by Buyer.

"**Knowledge of Seller**" means the actual knowledge of John Paul Strasheim, Carlos Dewayne Tiller, Matt Tiller, Jason Goss and Jerid Strasheim as the founding members of Seller, after due inquiry.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"**Lien**" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest, encumbrance or other adverse claim of any kind in respect of such property or asset. For the purposes of this Agreement, a Person shall be deemed to own subject to a Lien any property or asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such property or asset.

"**Losses**" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the reasonable cost of pursuing any insurance providers; *provided, however*, that "Losses" shall not include (a) punitive or exemplary damages, except in the case of fraud or to the extent actually awarded to a Governmental Authority or other third party or (b) speculative damages.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition

(financial or otherwise) or assets of the Business, taken as a whole, (b) the value of the Purchased Assets, taken as a whole, or (c) the ability of Seller to consummate the transactions contemplated hereby on a timely basis; *provided, however*, that "Material Adverse Effect" shall not include any event occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Business operates; (iii) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof, or natural disasters, epidemics or pandemics; (v) any action required by this Agreement (or any related action) or any action taken (or omitted to be taken) with the written consent of Buyer; (vi) any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof; (vii) the announcement, pendency or completion of the transactions contemplated by this Agreement; (viii) any natural or man-made disaster or acts of God; or (x) by itself, any failure by the Business to meet any projection, forecast or revenue or earnings prediction for any period ending after the date of this Agreement; *provided, further*, however that any event, occurrence, fact, condition or change referred to in clauses (i) through (iii) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or could reasonably be expected to occur to the extent that such event, occurrence, fact, condition or change has a disproportionate effect on the Business compared to other participants in the industries in which the Business operates.

"**Notice**" has the meaning set forth in **Section 2.5(e)**.

"**Old Cosmos HoldCo**" means Cosmos Holdings LLC a single manager, manager-managed Oregon limited liability company that shall be formed by the Seller for the sole purpose of acquiring and holding the Juanita's Snacks Economic Interest.

"**Party**" or "**Parties**" has the meaning set forth in the Preamble.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates (including certificates of need and safety certificates), variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"**Permitted Encumbrances**" means (i) Liens for Taxes not yet due and payable for which adequate reserves have been established in accordance with GAAP, (ii) statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen and repairmen incurred in the ordinary course of business consistent with past practice if the underlying obligations are not yet delinquent and (iii) zoning, building, or other restrictions, variances, covenants, rights of way, encumbrances, easements and other minor irregularities in title, none of which, individually or in the aggregate, (A) interfere in any material respect with the present use of or occupancy of any property of the Company, (B) have more than an immaterial effect on the value thereof or (C) would impair the ability of such property to be sold for its present use.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"**Products**" means the products manufactured, produced, and supplied under the Brands.

"**Purchase Price**" has the meaning set forth in **Section 2.5(a)**.

"**Purchased Assets**" has the meaning set forth in **Section 2.1**.

"**Representative**" means, with respect to any Person, any and all Affiliates, directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Release**" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture.

"**Schedule Supplement**" has the meaning set forth in **Section 6.7**.

"**Seller**" has the meaning set forth in the Preamble.

"**Seller Indemnitees**" has the meaning set forth in **Section 9.4**.

"**Seller's Closing Certificate**" has the meaning set forth in **Section 8.1(l)**.

"**Seller's Secretary Certificate**" has the meaning set forth in **Section 8.1(m)**.

"**Strasheim Employment Agreement**" means an agreement for John Strasheim to be employed by Buyer after the Closing, on such commercially reasonable terms as Buyer and John Strasheim may negotiate and agree prior to the Closing.

"**Subsidiary**" means, with respect to any Person, any other Person of which fifty percent (50%) or more of the capital stock, other equity interests or other interests entitled to vote in the election of directors or comparable Persons performing similar functions are at the time owned or controlled, directly or indirectly through one or more Subsidiaries, by such Person.

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Third Party Claim**" has the meaning set forth in **Section 9.6(a)**.

"**Title Company**" shall mean [_____].

"**Title Objection Notice**" has the meaning set forth in **Section 6.3(c)**.

"**Title Reply Notice**" has the meaning set forth in **Section 6.3(c)**.

"**Transaction Documents**" means this Agreement, the Bill of Sale, the Deed, the Assignment and Assumption Agreement, the Intellectual Property Assignment and the other agreements, instruments and documents required to be delivered at the Closing.

"**True-Up Adjustment**" has the meaning set forth in **Section 2.5(e)**.

"**Unreviewed Financial Statements**" has the meaning set forth in **Section 4.4**.

**EXHIBIT A**

**ALLOCATION SCHEDULE**

| Class III Assets (accounts receivable) | Seller's book value |
|---|---|
| Class IV Assets (inventory) | Seller's book value |
| Class V Assets (equipment, land, buildings, etc.) | Equipment:  $1,000,000<br><br>Land, Buildings:  $8,000,000 |

**EXHIBIT B**

**FORM OF BILL OF SALE**

**EXHIBIT C**

**FORM OF DEED**

**EXHIBIT A
Page 52 of 59**

**EXHIBIT D**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

**EXHIBIT E**

**INTELLECTUAL PROPERTY ASSIGNMENT**

**EXHIBIT F**

**BID PROCEDURES ORDER**

**EXHIBIT A**
**Page 55 of 59**

**SCHEDULE 2.1(a)**

**REAL PROPERTY**

Commonly known as:

1.  395 East 1st Ave., Junction City, OR  97448.

2.  120 West 1st Ave., Junction City, OR  97448.

**SCHEDULE 2.1(e)**

**ASSIGNED CONTRACTS**

TBD

**SCHEDULE 2.3**
**ASSUMED LIABILITIES**

Promissory Note, dated October 1, 2017, payable by Seller to American Pop Corn Company in the original principal amount of $160,000.

**SCHEDULE 8.1(s)**

**KEY EMPLOYEES**

John Paul Strasheim

Jerid Strasheim

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 19-62049-tmr11 |
| **4 Him Food Group, LLC**, an Oregon corporation, dba **Cosmos Creations,** | |
| Debtor. | **ORDER (1) AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS AND OTHER INTERESTS, (2) APPROVING SALE PROCEDURES, AND (3) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** |

This matter came before the Court on _____ __, 2019, on the Motion for Orders (1) Authorizing and Scheduling an Auction for the Sale of Substantially All Assets of the Debtor Free and Clear of Liens and Other Interests, (2) Approving Sale Procedures, (3) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases, (4) Approving Purchase Agreement or Subsequent Overbid, (5) Scheduling a Hearing to Consider Approval of the Sale, (6) Establishing the Form and Manner of Notices Related Thereto, (7) Requesting Waiver of the Stay Under Bankruptcy Rule 6004(f) and 6006(d) filed on August 19,

Leonard Law Group LLC
1 SW Columbia St., Ste 1100
Portland, Oregon 97258
leonard-law.com

**EXHIBIT B
Page 1 of 23**

2019 (Docket No. ___) (the "**Motion**"). The Court, having held an initial hearing on the Motion on _____ ___, 2019, and having considered the submissions and arguments of counsel and the files and records herein, and being now fully advised in of the premises,

FINDS as follows:

A.     This Court has jurisdiction over this matter and the case of 4 Him Food Group, LLC, dba Cosmos Creations (the "**Debtor**"), the Motion and the parties and property affected pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). To the extent required by law, each creditor and party in interest has acknowledged and consented to this Court's authority to enter this Sale Procedures Order as a final order of this Court, or all challenges to this Court's jurisdiction over this matter have been overruled or waived.

B.     Findings of fact herein shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact as appropriate.

C.     The notice provided regarding the Motion constitutes sufficient and adequate notice. No further notice in connection with the entry of this Order is or shall be required.

D.     The Sale Procedures (attached as **Exhibit 1** to this Order) were proposed by the Debtor in good faith with the goal of maximizing the value of the Purchased Assets[1] for the benefit of all creditors of the estate and other parties-in-interest. The Debtor has articulated good and sufficient reasons for authorizing and approving the Sale Procedures, which are reasonable and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of, the Purchased Assets.

E.     The proposed Sale Notice (attached as **Exhibit 2** to this Order) is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of this Order, the sale, the auction, and the assumption procedures.

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the Motion and/or the Agreement.

**Page 2 of 7 - ORDER APPROVING SALE PROCEDURES**

LEONARD LAW GROUP LLC
1 S[illegible] [illegible] 1[illegible]0
Portland, Oregon 97[illegible]
[illegible]nard-law.com

**EXHIBIT B**
**Page 2 of 23**

F.      On or around August 14, 2019, Debtor and Juanita's Snacks, LLC ("**Buyer**")
entered into an Asset Purchase Agreement (the "**Agreement**") pursuant to which Buyer agreed
to purchase the Purchased Assets, subject to the conditions set forth in the Agreement.

G.      The Debtor has established and proved good and sufficient reasons for approval of
the proposed sale under the terms of the Agreement, subject to the sale procedures set forth in
this Order.

H.      Entry of this Order is in the best interests of Debtor, its estate, creditors and other
parties-in-interest.

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1.      All responses or objections to the relief requested in the Motion and the exhibits
thereto that have not been withdrawn, waived or settled are overruled.

2.      The Sale Procedures attached as **Exhibit 1** are approved and shall be used in
connection with the proposed sale of the Purchased Assets.

3.      The Sale Notice in the form attached hereto as **Exhibit 2**, is hereby approved. A
copy thereof shall be served upon the following parties within two business days of the entry of
this Order: (i) Buyer; (ii) the Creditors' Committee; (iii) the Secured Creditors; (iv) all equity
interest holders; (v) all other persons or entities holding or claiming to have liens or interests in
any of the Purchased Assets; (vi) the Office of the United States Trustee; (vii) all creditors of the
Debtor; (viii) the Internal Revenue Service, the Oregon Department of Revenue, and any other
entity to whom any tax or other charge may be due, or owing; (ix) all individuals or entities, if
any, which have contacted the Debtor to express interest in purchasing the Purchased Assets; (x)
all individuals or entities, if any, whom the Debtor believes might have an interest in purchasing
the Purchased Assets; (xi) all parties requesting special notice in this Chapter 11 case; and (xii) all
other persons or entities required to be served pursuant to orders of this Court, or known counsel
for any of the foregoing.

Leonard Law Group LLC
1 SW Columbia St., Ste. 1850
Portland, Oregon 97204
leonard-law.com



**EXHIBIT B**
**Page 3 of 23**

4.     Any objections to the proposed Sale shall be in writing and filed with this Court no later than _____ __, **2019** at 5:00 p.m. Pacific Time. Any objection not filed, served, and/or advocated in accordance with this paragraph may be deemed waived and may be forever barred.

5.     The Auction, if necessary, will be held on _____ __, **2019**, at 9:00 a.m. Pacific Time, at the office of Leonard Law Group, LLC, 1 SW Columbia, Portland, OR 97204. The auction will be conducted openly, and all creditors will be permitted to attend. A record will be made of bidding at the Auction.

6.     The Sale Hearing will be conducted on _____ __, **2019,** at __:__ _.m. Pacific Time, before the Honorable Thomas M. Renn, in Courtroom 5 of the U.S. Bankruptcy Court, 405 E. 8th Ave., Eugene, OR 97401, to consider the entry of an order providing and approving, *inter alia*, the following: (a) the sale or other disposition of Debtor's assets to the Successful Bidder or Bidders free and clear of all liens, claims, interests obligations, and encumbrances in accordance with 11 U.S.C. § 363(f); (b) that Successful Bidder or Bidders have not assumed any liability or obligations (except as specifically assumed by the successful bidder in the Asset Purchase Agreement signed by the respective bidder, as may be amended in a writing signed by the respective bidder or otherwise specifically provided in the Order Confirming the Plan); (c) that Successful Bidder or Bidders are not successors to Debtor; (d) that all persons who have received the Notice are bound by the order and are enjoined from pursuing Successful Bidder or Bidders to recover on any claims they may have against Debtor; and (e) that the sale agreement or agreements were entered into in good faith, without collusion, and from arms' length bargaining positions. The Debtor shall be deemed to have accepted a bid and the Successful Bidder determined only when the bid for the Assets has been approved by the Court at the Sale Hearing.

7.     The Assumption Procedures are hereby approved as set forth below.

a.     <u>Notice</u>. On or before _____ __, 2019, the Debtor will provide notice in the form of the Assumption and Assignment Notice attached hereto as **Exhibit 3** (the

**Page 4 of 7 – ORDER APPROVING SALE PROCEDURES**

LEONARD LAW GROUP LLC
1 SW Columbia, Suite 1100
Portland, Oregon 97204
leonard-law.com

**EXHIBIT B**
**Page 4 of 23**

"**Assumption and Assignment Notice**") to each non-debtor counterparty to a Material

Agreement that Buyer designates for assumption and assignment, if any. The Assumption and

Assignment Notice shall identify the proposed amount to be paid to such counterparty to cure all

defaults under such agreement that are required to be cured pursuant to section 365 of the

Bankruptcy Code as a prerequisite to assumption (together with the timing of such payments, if

any) (the "**Cure Schedule**").

    b.  <u>Objections</u>. Objections, if any, to the proposed assumption and

assignment of any Material Agreements to Buyer, including any objection to the cure amount set

forth on the Cure Schedule or to adequate assurance of future performance, must be made in

writing and filed with the Court no later than _____ \_\_\_, 2019 (the "**Assumption Objection**

**Deadline**").

    c.  <u>Resolution of Objections</u>. If no objection to assumption or assignment is

filed by a counterparty to a Material Agreement before the Assumption Objection Deadline, the

counterparty to the assumed agreement shall be deemed to consent to the assumption and

assignment of such assumed agreement. If no objection to the proposed cure amount with

respect to an assumed agreement, then the cure amount set forth in the Cure Schedule shall be

binding upon the non-debtor party with respect to such assumed agreement for all purposes in

this Chapter 11 case, and will constitute a final determination of the total cure amount required to

be paid in connection with the assumption and assignment thereof. In that event, the Debtor and

Buyer may provide in the Sale Order for the assumption and assignment of the applicable

Material Agreement to Buyer (or other Successful Bidder) and for payment of the cure amount, if

any, specified in the Assumption and Assignment Notice, all without further notice to that

counterparty. If a timely objection is filed by the Assumption Objection Deadline and such

objection cannot otherwise be resolved by the parties, the Bankruptcy Court may hear such

objection at the Sale Hearing, or any adjourned date thereof. The pendency of a dispute relating

Leonard Law Group LLC
1 SW Columbia, Suite 1160
Portland, Oregon 97204
leonard-law.com

to a proposed cure amount will not delay the closing of the sale, including the assumption and assignment of Material Agreements necessary to effectuate such closing.

        d.    <u>Effect of Qualified Alternative Bids</u>.  If Acceptable Bids are received by the Debtor, and if Buyer is not the Successful Bidder at the Auction, the Debtor will provide an amended Assumption and Assignment Notice to each non-Debtor counterparty to any contracts or leases designated by the Successful Bidder for assumption and assignment.  Such amended assumption and assignment notice shall identify the Successful Bidder, and shall provide information to the non-debtor counterparties regarding the ability of the Successful Bidder to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code.  Objections, if any, to the proposed assumption and assignment of any contract or lease designated a Successful Bidder other than Buyer must be made in writing and filed with the Court on a date to be fixed by the Court at the Sale Hearing.

        e.    <u>Timing of Assignment</u>.  Each Material Agreement will be assumed and assigned to Buyer or the Successful Bidder (as applicable) on the date (the "**Assumption Effective Date**") that is the later of (i) the Proposed Assumption Effective Date, and (ii) the Assumption Resolution Date (as defined below).  The "Assumption Resolution Date" shall be, (i) if no Contract Objection has been filed on or prior to the Contract Objection Deadline, the business day after the Contract Objection Deadline, or (ii) if a Contract Objection has been filed on or prior to the Contract Objection Deadline, the date of the Assumption Resolution Stipulation or the date of a Court order authorizing the assumption and assignment to Buyer or the Successful Bidder (as applicable) of the Assumed Contract or Assumed Lease.  If Buyer is the Successful Bidder, the Assumption Effective Date shall not be later than the Closing Date.

        8.    The failure of any third party to file and serve an objection as ordered and directed herein shall be deemed the consent of such a party to the sale and transfer of the Purchased Assets to Buyer or the Successful Bidder (including the assumption and assignment of the Material Agreements and the fixing of any applicable Cure Costs).

LEONARD LAW GROUP LLC
1 SW Columbia Street, Suite 1160
Portland, Oregon 97204
leonard-law.com

**EXHIBIT B
Page 6 of 23**

9.     Unless otherwise specified, all time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

# # #

CERTIFICATION OF COMPLIANCE WITH LBR 9021-1(a)(2)(A)

I certify that I have complied with the requirements of LBR 9021-1(a)(2)(A).

PRESENTED BY:

LEONARD LAW GROUP LLC

    [unsigned proposed version]
Timothy A. Solomon, OSB 072573
Justin D. Leonard, OSB 033736
Holly C. Hayman, OSB 114146
Proposed Counsel to Debtor and Debtor in Possession

c:     ECF Participants

**Page 7 of 7 – ORDER APPROVING SALE PROCEDURES**

Leonard Law Group LLC
1 SW Columbia St 1160
Portland, Oregon 97204
bonard-law.com

**EXHIBIT B**
**Page 7 of 23**

Case 19-62049-tmr11     Doc 48     Filed 08/19/19

**EXHIBIT 1**

**SALE PROCEDURES**

**EXHIBIT B**
**Page 8 of 23**

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>**4 Him Food Group, LLC**, an Oregon corporation, dba **Cosmos Creations,**<br><br>Debtor. | Case No.   19-62049-tmr11<br><br>NOTICE RE: SALE PROCEDURES FOR THE SUBMISSION, RECEIPT AND ANALYSIS OF BIDS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S BUSINESS ASSETS |

These Sale Procedures have been approved by order (the "**Sale Procedures Order**") of the United States Bankruptcy Court for the District of Oregon (the "**Court**") in connection with the above-captioned chapter 11 bankruptcy case of 4 Him Food Group, LLC dba Cosmos Creations ("**Debtor**").

The procedures set forth the process by which Debtor is authorized to conduct the sale (the "**Sale**") by auction (the "**Auction**") of substantially all of Debtor's business assets as more particularly described in the Agreement (defined below). These Sale Procedures also set forth the terms by which prospective bidders may qualify for and participate in the Auction, thereby competing to make the highest and/or best offer for the assets being sold.

### A. Stalking Horse Bidder

On or around August 14, 2019, Debtor and Juanita's Snacks, LLC ("**Juanita's**" or "**Buyer**") entered into an Asset Purchase Agreement (the "**Agreement**") for the acquisition of all of Debtor's assets as described in the Agreement (the "**Purchased Assets**"). Among other things, Buyer agreed to pay a purchase price cash in the sum of **$9,000,000**, plus (ii) assumption of Assumed Liabilities (as defined in the Agreement), plus (iii) a credit bid in the amount of Buyer's secured claim against (a) the book value of Seller's usable and non-obsolete Inventory, and (b) the book value of Seller's current accounts receivable for sales of inventory by Seller not more than 60 days prior to the Closing (the "**Purchase Price**") for the Purchased Assets (with the value of such credit bid estimated at approximately **$2,000,000**), subject to the outcome of the Auction and the entry of an order of the Court (the "**Sale Order**") approving the sale of the Purchased Assets.  A copy of the Agreement has been filed with the Court and may be obtained by contacting Debtor's Counsel (Timothy A. Solomon, Leonard Law Group LLC, 1 SW Columbia, Ste. 1010, Portland, OR 97204, tsolomon@LLG-LLC.com, 971-634-0194).

### B. Participation Requirements

To participate in the bidding process and to obtain access to due diligence materials, any person interested in purchasing the Assets (an "**Potential Bidder**") must deliver (unless previously delivered) to both Debtor and counsel for Debtor the following (the "**Preliminary Bid Documents**"):

1. An executed confidentiality agreement in form and substance acceptable to Debtor and its counsel;

2. Preliminary written proof by the Potential Bidder of its financial capacity to close the proposed transaction, to pay the amounts that would be due at Closing, including, but not limited to, its ability to satisfy the standards to provide adequate assurance of future performance of any contracts and leases to be assumed and assigned under Section 365 of the Bankruptcy Code, which may include current unaudited or verified financial statements of, or verified financial commitments (i.e., banking or capital references) obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach), the adequacy of which must be deemed satisfactory to Debtor in its business judgment.

As soon as practicable, and in any event within two business days after a Potential Bidder delivers the Preliminary Bid Documents, Debtor shall determine and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents. Debtor shall work with Potential Bidders during the two business-day period (as it may be extended by Debtor) to attempt to correct or cure any deficiencies in any Preliminary Bid Documents. Only those Potential Bidders whose Preliminary Bid Documents have been deemed acceptable at the end of such two business-day period (as it may be extended by Debtor) (each, an "**Acceptable Bidder**") may conduct a due diligence review with respect to the Assets or submit bids to acquire the Assets. Juanita's is deemed an Acceptable Bidder

## C. Due Diligence Access

After receipt of an executed confidentiality agreement and notification of Acceptable Bidder status, Debtor will provide each Acceptable Bidder reasonable due diligence information, as requested as soon as reasonably practicable after such request. Debtor shall be entitled to use its business judgment in determining the extent to which an Acceptable Bidder is entitled to receive confidential competitive information.

## D. Bid Requirements

Any Acceptable Bidder that is interested in being a participant in the Auction and acquiring all or substantially all of the Assets (each a "**Bidder**") must submit a "Bid" as provided herein prior to 5:00 p.m. Pacific Time on _____ __, **2019** (the "**Bid Deadline**"). Any such Bid must:

1. Identify the proponent of the Bid and an officer or employee who is authorized to appear, act on behalf of and bind the Bidder;

2. Identify any party for whom the Bidder may be bidding with or on behalf of, indicate whether the bidder is a party to any agreement limiting the bidders at the Auction, and identify any relation of such parties to Debtor.

3. Contain (a) a signed definitive asset purchase agreement in substantially the form of the Agreement (a "**Competing Purchase Agreement**") and (b) a comparison of such Competing Purchase Agreement to the Agreement, showing all the differences between the two. A Competing Purchase Agreement must:

   i. Be in form and substance satisfactory to Debtor;

PAGE 2   NOTICE REGARDING SALE PROCEDURES

**EXHIBIT B**
**Page 10 of 23**

Case 19-62049-tmr11    Doc 48    Filed 08/19/19

ii.   Clearly designate the assets to be acquired (which must be all or substantially all of the Purchased Assets);

iii.   Provide that the purchase price shall be at least $11,350,000 (*i.e.*, $100,000 more than the $9,000,000 cash and $2,000,000 credit bid Purchase Price contained in the Agreement executed by Buyer), plus the Expense Reimbursement) (collectively, "**Minimum Initial Overbid Amount**"), and that the Expense Reimbursement, and the Purchase Price will be paid in cash, subject to the same adjustments (except for Buyer's credit bid), escrow, and other terms of the Agreement;

iv.   Be accompanied by a deposit in the form of cash, cashier's check or letter of credit issued by a federal or state chartered domestic bank in the amount of $500,000;

v.   Not be subject to any (a) financing contingency; (b) contingency relating to the completion of unperformed due diligence; (c) contingency relating to the approval of the Bidder's board of directors or other internal approvals or consents; or (d) any conditions precedent to the Bidder's obligation to purchase the Assets, other than those conditions included in the Agreement; and

vi.   Not provide for the payment to the Bidder of any Break-Up Fee, topping fee, expense reimbursement or other similar fee or arrangement.

4.   Be accompanied by financial information for the bidder sufficient to enable Debtor to determine the bidder's creditworthiness and ability to close a sale of the Assets, and pay the full Expense Reimbursement to Buyer within three days after entry of the Sale Order if the bidder is the Successful Bidder, including information sufficient to demonstrate the bidder's ability to provide adequate assurance of future performance of obligations under any executory contracts or unexpired leases to be assumed and assigned to the bidder;

5.   By its terms, remain open and irrevocable through the conclusion of the Sale Hearing, unless extended by agreement of the parties.

6.   Be submitted to counsel for Debtor so as to be received not later than the Bid Deadline. Any Bid that meets all of the foregoing requirements, as determined by Debtor in its good faith discretion, shall be considered a "Qualified Bid." Counsel for Debtor shall, as soon as practicable, send a copy of each Qualified Bid received, if any, to the following parties: (i) counsel to the secured creditors, (ii) the Creditors Committee and its counsel (if any); (iii) the United States Trustee; and (iv) counsel to each Bidder submitting a Qualified Bid (or if a Bidder does not have counsel, to the Bidder).

### E.  Evaluation of Qualified Bids

Prior to the Auction, Debtor shall evaluate the Qualified Bids and identify the Qualified Bid that is, in Debtor's business judgment, the highest or otherwise best bid (the "**Starting Bid**"). No later than 2:00 p.m. two days prior to the Auction, Debtor shall notify Juanita's and all parties who have submitted Qualified Bids (each a "**Qualified Bidder**") as to whether there will be an Auction, and if so, which Qualified Bid is the Starting Bid. If any interested bidder is

PAGE 3   NOTICE REGARDING SALE PROCEDURES

**EXHIBIT B**
**Page 11 of 23**

Case 19-62049-tmr11   Doc 48   Filed 08/19/19

deemed to be "unqualified" by Debtor and will therefore be precluded from participating in the auction, then, on the request to such unqualified bidder, the Auction will be delayed, or if commenced, temporarily adjourned, while Debtor shall bring the issue to the Court for an immediate determination. Thereafter, the Auction shall proceed with or without the participation of the affected potential bidder, in accordance with the court's ruling.

### F. No Qualified Bids

If no Qualified Bids are received by the Bid Deadline, then the Auction will not occur and Juanita's will be deemed the Successful Bidder. Subject to the termination rights under the Agreement, Debtor will immediately pursue entry of a Sale Order by the Court approving the Purchase Agreement and authorizing the sale of the Assets to Juanita's.

### G. Auction

In the event Debtor determines that one or more Bids are Qualified Bids, then Debtor will conduct the Auction on _____, **2019** at _:_0_.m. (the "**Auction**") with respect to the sale of the Purchased Assets at 1 SW Columbia, Portland, OR 97204, or at such other location as may be designated by Debtor. The Auction will be conducted in accordance with the following procedures (the "**Auction Procedures**"):

1. The Qualified Bidders, including Juanita's, shall appear in person or through duly-authorized representatives at the Auction.

2. Only Qualified Bidders, including Juanita's, shall be entitled to bid at the Auction.

3. Bidding at the Auction shall begin at the Starting Bid.

4. Subsequent bids at the Auction, including any bids by Juanita's, shall be made in minimum increments of $100,000 or as otherwise agreed by the Bidders or as set by Debtor.

5. All bidding will be open, and all creditors are permitted to attend.

6. A record of bidding at the Auction will be made. Such record may be transcribed by a certified court reporter to ensure an accurate recording of the bidding at the Auction.

7. Each Qualified Bidder will be required to confirm on the record at the Auction that it has not colluded with any other person with respect to the bidding or the Sale.

8. The Auction shall be governed by such other procedures as may be announced by Debtor or its counsel from time to time at the Auction; provided that any such other procedures shall not be inconsistent with the Sale Procedures Order or any other order in Debtor's Chapter 11 case.

### H. Acceptance of the Successful Bid

Upon the conclusion of the Auction (if such Auction is conducted), Debtor, in the exercise of its reasonable, good-faith business judgment, shall identify the highest or otherwise best bid (the "**Successful Bid**"). The Qualified Bidder having submitted the Successful Bid will

be deemed the "Successful Bidder." The Successful Bidder and Debtor shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which the Successful Bid was made.

Debtor will present the results of the Auction to the Court at the Sale Hearing (as defined below), at which certain findings will be sought from the Court regarding the Auction, including, among other things, that (1) the Auction was conducted, and the Successful Bidder was selected, in accordance with these Sale Procedures, (2) the Auction was fair in substance and procedure, (3) the Successful Bid was a Qualified Bid, and (4) consummation of the Sale contemplated by the Successful Bid is in the best interests of Debtor and its estate.

If an Auction is held, Debtor shall be deemed to have accepted a Qualified Bid only when (1) such bid is declared the Successful Bid at the Auction or by the Court, and (2) definitive documentation has been executed in respect thereof. Such acceptance is conditioned on approval by the Court of the Successful Bid and the entry of an Order approving such Successful Bid.

## I. Bankruptcy Court Approval of Sale

A hearing to consider approval of the sale to the Successful Bidder (or to approve the Purchase Agreement and the sale to Juanita's if no Auction is held) (the "**Sale Hearing**") and seek entry of a Sale Order is presently scheduled to take place at __:__ .m. on _____, **2019**, Pacific Time or at such other time as is announced at the Auction by Debtor. The Sale Hearing will be held before the Honorable Thomas M. Renn, United States Bankruptcy Judge for the United States Bankruptcy Court for the District of Oregon, in Courtroom 5 of the U.S. Bankruptcy Court, 405 E. 8th Ave., Eugene, OR 97401. Debtor and the Successful Bidder, once the Successful Bidder has been determined, shall each use their commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of a Sale Order in a form reasonably acceptable to Debtor and the Successful Bidder. Any objections to the Auction results must be filed with the Court by 5:00 p.m. Pacific Time on _____, **2019**. The Sale Hearing may be continued to a later date by Debtor by sending notice to all prospective bidders prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.

## J. Designation of Back-Up Bidder

Upon the conclusion of the Auction and the selection of the Successful Bidder, Debtor shall select the person submitting the next highest or otherwise best bid (the "**Back-Up Bidder**"). The bid of the Back-Up Bidder shall remain open until the closing of a sale to the Successful Bidder. If for any reason the Successful Bidder is unable or unwilling to consummate an approved sale because of breach or failure to perform on the part of the Successful Bidder, the Back-Up Bidder shall be deemed to be the Successful Bidder. The purchase price shall be the amount of such Back-Up Bidder's last bid, and Debtor shall be authorized to effectuate the sale to the Back-Up Bidder without further order of the Bankruptcy Court. If, for any reason, the Back-Up Bidder fails to perform, Juanita's agrees that if Debtor tenders full performance of all of its obligations under the Purchase Agreement to Juanita's on or before _____, **2019**, and the Purchase Agreement is not otherwise materially breached by Debtor, Juanita's shall purchase the Purchased Assets under the terms of the Agreement.

## K. Reservation of Rights to Modify Sale Procedures

Debtor reserves the right to modify these Sale Procedures in any manner that will best promote the goals of the bidding process and may impose, at or prior to the Auction, additional

**EXHIBIT B**
**Page 13 of 23**

customary terms and conditions on the sale, including, without limitation, extending the deadlines set forth in these Sale Procedures, adjourning the Auction at the Auction, and/or adjourning the Sale Hearing in open court without further notice. Unless all qualified bidders agree to a change in the auction procedures, the auction procedures will not be changed absent a future Court order.

DATED: _____, 2019

LEONARD LAW GROUP LLC

By: _____
       Timothy A. Solomon, OSB 072573

**EXHIBIT 2**

**SALE NOTICE**

**EXHIBIT B**
**Page 15 of 23**

| | |
|---|---|
| In re<br><br>**4 Him Food Group, LLC**, an Oregon corporation, dba **Cosmos Creations,**<br><br>Debtor. | Case No.    19-62049-tmr11<br><br>NOTICE OF (1) MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S BUSINESS ASSETS; (2) AUCTION; (3) BIDDING PROCEDURES; (4) SALE HEARING; AND (5) OBJECTION DEADLINES |

**PLEASE TAKE NOTICE** that 4 Him Food Group, LLC, dba Cosmos Creations ("**Movant**" or the "**Debtor**"), has filed a motion (Docket No. ___) (the "**Sale Motion**") for approval of the sale of all or substantially all of its business assets as more particularly described in the Asset Purchase Agreement described below (the "**Purchased Assets**"), free and clear of all liens, claims and encumbrances pursuant to 11 U.S.C. § 363(f). Movant's name, address, and telephone number are: 4 Him Food Group, LLC, dba Cosmos Creations, c/o Timothy A. Solomon, Leonard Law Group LLC, 1 SW Columbia, Ste. 1010, Portland, OR 97258, tsolomon@LLG-LLC.com, 971-634-0194.

If you wish to object to any aspect of the sale or fees disclosed in paragraph 7 or 15 below, you must: (1) attend the hearing set in paragraph 16 below; and (2) within 21 days of the later of the date next to the signature below or the service date in paragraph 18 below (the "**Objection Deadline**"), file with the clerk at 405 E 8th Ave., #2600, Eugene OR 97401: (a) a written response stating the specific facts upon which the objection is based, and (b) a certificate of service of the response on Movant.

This document shall constitute the notice required by LBR 2002-1.

1.      The specific subsections of 11 U.S.C. § 363(f) Movant relies upon for authority to sell the property free and clear of liens are 11 U.S.C. §§ 363(f)(1)-(4).

2.      Unless a higher and better bid is received, the sale shall be to Juanita's Snacks, LLC ("**Juanita's**"). Juanita's has no relation to the Debtor.

3.      General description of the Purchased Assets: substantially all property of the Debtor, including (a) the real property located at the following street addresses: (i) 395 East 1st Ave., Junction City, OR 97448; and (ii) 120 West 1st Ave., Junction City, OR 97448; (b) all intellectual property; (c) all equipment; (d) all Inventory; (e) certain contracts, (f) certain accounts receivable; (g) goodwill, and other property all as set forth in Section 2.2 of the Asset Purchase Agreement dated as of August 14, 2019  (the "**Agreement**"), entered into between the Debtor and Juanita's. A copy of the Agreement was filed with the Court, and may also be obtained by contacting Debtor's counsel.

4.       Copies of the full property description, including the Legal Description of the real property (which is attached to the copy of this Notice filed with the court), are available upon request from Movant.

PAGE1      NOTICE OF (1) MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S BUSINESS ASSETS; (2) AUCTION; (3) BIDDING PROCEDURES; (4) SALE HEARING; AND (5) OBJECTION DEADLINES

**EXHIBIT B
Page 16 of 23**

Case 19-62049-tmr11    Doc 48    Filed 08/19/19

5.     The Purchased Assets may be viewed by appointment by contacting Movant.

6.     Other than Juanita's and the Debtor, there are no other parties to the proposed sale transaction.

7.     The gross sales price is: (i) the sum of $9,000,000 in cash, subject to adjustments, (ii) a credit bit of Juanita's additional secured claims against the Debtor (estimated at approximately $2,000,000), and (iii) assumption of certain liabilities, as further set forth in Section 2.5 of the Agreement. All liens on the Purchased Assets total approximately $11,206,411, of which Movant believes a total of at least $2.26 million need not be paid in cash as secured claims (because the lien is avoidable, the lienholder consents to less than full payment, the lien is to be credit bid in addition to the cash purchase price, and/or other reasons). Secured creditors may also seek reimbursement of fees and costs in an unknown amount. Sales costs are expected to be minimal; however, the Debtor may hire a broker, subject to advance approval from the Court, in which case an additional fee is likely to be paid from the sale proceeds. All tax consequences have been considered and it presently appears the sale will result in net proceeds to the estate after payment of valid liens, fees, costs and taxes of an amount sufficient to pay all administrative claims and provide for a distribution to unsecured creditors.

8.     The sale is of one of substantially all of the Debtor's assets. Terms and conditions of sale are set forth in (a) the Agreement and (b) in the Order (1) Authorizing and Scheduling an Auction for the Sale of Substantially all Assets of the Debtor Free and Clear of Liens and Other Interests, (2) Approving Sale Procedures, and (3) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases (Docket No. ___) (the "**Sale Procedures Order**") (copies of which are available from Movant).

9.     Competing bids must be submitted to the Movant no later than _____ __, 2019, and must be in the amount of at least $11,350,000, and be on the same or more favorable terms to the estate. If one or more competing offers from qualified bidders are received, an auction (the "**Auction**") shall be held to determine the winning bidder for the Purchased Assets. Bids must comply with the procedures set forth in the Sale Procedures Order.

10.     Information regarding valuation, appraisals, and opinions of value are available upon request from Movant.

11.     It is anticipated that the sale will lead to equity for the estate. Expenses and taxes resulting from the sale will be paid through bankruptcy court order or via a chapter 11 plan. If there is little or no equity for the estate after the sale, the reason for the sale is to maximize the value of the Debtor's assets.

12.     The reason for proposing the sale in advance of approval of a plan of reorganization is to maximize the value of the Debtor's assets and minimize losses and diminution that would be sustained either by continued operations or by a shutdown of the Debtor's business.

13.     The following information relates to lienholders (who are listed in apparent order of priority but may be subject to intercreditor subordination agreements or other factors that may affect priority):

PAGE 2     NOTICE OF (1) MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S
          BUSINESS ASSETS; (2) AUCTION; (3) BIDDING PROCEDURES; (4) SALE HEARING;
          AND (5) OBJECTION DEADLINES

EXHIBIT B
Page 17 of 23

Case 19-62049-tmr11     Doc 48     Filed 08/19/19

| Creditor | Service Address | Amount Owed |
|---|---|---|
| Columbia State Bank | Attn: Hadley S. Robbins, CEO<br>1301 A St. Suite 800<br>Tacoma, WA 98402 | $5,463,000 |
| Lane County | c/o Stephen E. Dingle, county counsel<br>125 E. 8th Avenue<br>Eugene, OR 97401 | $846 |
| 2Loris, LLC | c/o Randy McPherson, Registered Agent<br>1247 Crenshaw Rd.<br>Eugene, OR 97401 | $2,387,265 |
| Celtic Capital Corporation | Attn: Mark Hafner, President<br>23622 Calabasas Rd. Suite 323<br>Calabasas, CA 91302 | $1,095,300 |
| Dominguez Family Enterprises, Inc. | Attn: Ruben Cleaveland, Reg. Agent<br>417 Sherman Avenue, Suite 7<br>Hood River, OR 97031 | $2,000,000 |
| OnDeck Capital | c/o Corporation Service Company<br>Registered Agent<br>251 Little Falls Drive<br>Wilmington, DE 19808 | $260,000*<br><br>*lien may be avoidable |

Treatment of secured claims at closing shall be subject to a separate distribution motion to be filed with the Court by Movant. Liens shall attach as specified in Paragraph 14, below.

14.     Any liens not fully paid at closing shall attach to the sale proceeds in the same order of priority they attach to the property. Any proceeds remaining after paying liens, expenses, taxes, commissions, fees, costs or other charges as provided in the Motion, shall be held in trust until the court orders payment.

15.     Although the Purchased Assets include real property, no real estate broker is involved and no commission will be paid.

16.     **A hearing on the Motion and any objection to the sale or fees described herein is scheduled for _____, 2019, at ___:___ _.m. in Courtroom 5 of the United States Bankruptcy Court, 405 E 8th Avenue, Eugene, OR, 97401.** Testimony will be received if offered and admissible. If no timely objection is filed, the hearing may be cancelled, and an order submitted. Parties are encouraged to check the hearing calendar at www.orb.uscourts.gov after the Objection Deadline has passed.

17.     The Debtor believes the sale to Juanita's is in the best interests of the estate because the sale will maximize the amount that the Debtor, its estate, and its creditors may realize for the value of the assets. Additionally, the Debtor's existing cash flow does not satisfy its debt service requirements, and Debtor has found that it is impossible to raise additional capital with its current equity and debt structure. Delaying a sale could seriously jeopardize the value of the Debtor's assets. The proposed order approving the sale provides that Juanita's shall have no liability or responsibility for any liability or other obligation of Debtor arising under or related to the Purchased Assets other than as expressly set forth in the Agreement, and that the transfer of the Purchased Assets to Juanita's will not subject Juanita's or its affiliates, successors or assigns,

PAGE 3     NOTICE OF (1) MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S BUSINESS ASSETS; (2) AUCTION; (3) BIDDING PROCEDURES; (4) SALE HEARING; AND (5) OBJECTION DEADLINES

**EXHIBIT B**
**Page 18 of 23**

Case 19-62049-tmr11     Doc 48     Filed 08/19/19

or their respective properties, to any liability for claims against Debtor or the Purchased Assets by reason of such transfer. Movant is also requesting that the Court waive the 14-day stay under Bankruptcy Rules 6004(h) and 6006(d).

18.     I certify that on _____, 2019, this document was served, pursuant to FRBP 7004, on the U.S. Trustee, each named lienholder at the address listed above, the creditors' committee chairpersons, and their attorneys; and that it was also sent on that date, pursuant to FRBP 2002(a), to all creditors and all parties as listed in the court's records that were obtained on _____ ___, 2019, a copy of which is attached to the document filed with the court.

19.     For further information, or to obtain copies of any of the pleadings or documents referenced herein may be obtained by contacting Debtor's counsel.


DATED: _____ ___, 2019


                    LEONARD LAW GROUP LLC

                    By: _____
                        Timothy A. Solomon, OSB 072573
                        1 SW Columbia, Ste. 1010
                        Portland, OR 97204
                        tsolomon@LLG-LLC.com
                        971-634-0194
                    Proposed counsel to Debtor

**PAGE 4**     **NOTICE OF (1) MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S BUSINESS ASSETS; (2) AUCTION; (3) BIDDING PROCEDURES; (4) SALE HEARING; AND (5) OBJECTION DEADLINES**

**EXHIBIT B**
**Page 19 of 23**

Case 19-62049-tmr11    Doc 48    Filed 08/19/19

**EXHIBIT 3**

**NOTICE OF ASSUMPTION AND ASSIGMENT OF
EXECUTORY CONTRACTS AND CURE AMOUNTS**

**EXHIBIT B
Page 20 of 23**

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>**4 Him Food Group, LLC**, an Oregon corporation, dba **Cosmos Creations,**<br><br><div align="center">Debtor.</div> | Case No.    19-62049-tmr11<br><br>NOTICE OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND CURE AMOUNTS |

4 Him Food Group, LLC, dba Cosmos Creations ("**Debtor**") filed a motion for approval of the sale of substantially all of its assets to Juanita's Snacks, LLC ("**Juanita's**"), or such higher and better offers from qualified bidders at an auction scheduled for __:__ __.m. on _____ ___, 2019. On _____, 2019, the Court entered an Order (1) Authorizing and Scheduling an Auction for the Sale of Substantially All Assets of the Debtor Free and Clear of Liens and Other Interests, (2) Approving Sale Procedures, (3) Approving Procedures For Assumption and Assignment of Executory Contracts and Unexpired Leases (Case Docket No. ___) (the "**Sale Procedures Order**") in connection with the sale and the auction, including procedures for the assumption and assignment of executory contracts. A copy of the Sale Procedures Order can be obtained from Debtor's counsel Debtor's Counsel (Timothy A. Solomon, Leonard Law Group LLC, 1 SW Columbia, Ste. 1010, Portland, OR 97258, tsolomon@LLG-LLC.com, 971-634-0194).

**PLEASE TAKE NOTICE** that _____ ___, 2019 at 5:00 p.m. Pacific Time is the deadline for any party to a contract or lease (the "**Material Agreements**") that Debtor proposes to assume and assign to Juanita's (or other higher and better bidder at the auction) to object to the amount Debtor asserts must be paid to cure any existing defaults under the Material Agreements (the "Cure Amounts"). The list of Material Agreements and the Proposed Cure Amounts are set forth on the attached **Exhibit 1**.

**PLEASE TAKE FURTHER NOTICE** that any party to a Material Agreement who disagrees with the Cure Amount or who objects to the assumption of its Material Agreement or to the assignment of its Material Agreement, must, on or before _____ ___, 2019, file with the Clerk of the Court, U.S. Bankruptcy Court, 405 E. 8th Ave #2600, Eugene, OR 97401, with a copy to Debtor's counsel, a written objection stating the specific facts upon which the objection is based.

**PLEASE TAKE FURTHER NOTICE** that unless a timely objection is filed as to a Cure Amount listed on **Exhibit 1**, the Cure Amount listed on **Exhibit 1** shall be binding upon the non-debtor party to such Material Agreement for all purposes in this Chapter 11 case and will constitute a final determination of the total Cure Amount required to be paid in connection with the assumption and assignment of such Material Agreement. Further, unless a timely objection is filed, no further evidence shall be required to satisfy the requirements for assumption and assignment, including, without limitation, any further evidence of adequate assurance of performance by Juanita's or other qualified purchaser, and the non-debtor party to the Material Agreement shall be barred from objecting to the assumption and assignment of such Material Agreement and shall be deemed to consent to the assumption and assignment of the Material Agreement.

**PLEASE TAKE FURTHER NOTICE** that if a timely objection is filed, a hearing on the Cure Amounts and Debtor's proposed assumption and assignment of the Material Agreements will be held on _____ __, 2019 at __:__ Pacific Time, or at such time as may be announced at that time, at Courtroom 5 of the U.S. Bankruptcy Court, 405 E. 8th Ave, Eugene, OR 97401.

**PLEASE TAKE FURTHER NOTICE** that the Debtor is requesting that the Court waive the 14-day stay under Bankruptcy Rule 6006(d).

Copies of any of the pleadings or documents referenced herein may be obtained by contacting Debtor's counsel at the address set forth above.

DATED: _____ __, 2019

                              LEONARD LAW GROUP LLC

                              By: _____
                                    Timothy A. Solomon, OSB 072573
                                    1 SW Columbia, Ste. 1010
                                    Portland, OR 97204
                                    tsolomon@LLG-LLC.com
                                    971-634-0194
                              Proposed counsel to Debtor

**EXHIBIT 1**
**LIST OF EXECUTORY CONTRACTS TO BE ASSUMED AND ASSIGNED**

*None*

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

In re

**4 Him Food Group, LLC**, an Oregon
corporation, dba **Cosmos Creations,**

Debtor.

Case No. 19-62049-tmr11

**ORDER APPROVING SALE OF ASSETS
OTHER THAN IN THE ORDINARY
COURSE OF BUSINESS FREE AND
CLEAR OF LIENS, CLAIMS,
INTERESTS AND ENCUMBRANCES**

On _____ \_\_, 2019, the Court conducted a hearing  (the "**Sale Hearing**") pursuant to

Motion of debtor 4 Him Food Group, LLC, dba Cosmos Creations (the "**Debtor**") for Orders

Authorizing and Scheduling an Auction for the Sale of Substantially All Assets of the Debtor

Free and Clear of Liens and Other Interests, (2) Approving Sale Procedures, (3) Approving

Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases, (4)

Approving Purchase Agreement or Subsequent Overbid, (5) Scheduling a Hearing to Consider

Approval of the Sale, (6) Establishing the Form and Manner of Notices Related Thereto, and (7)

Requesting Waiver of the Stay Under Bankruptcy Rule 6004(f) and 6006(d), filed on August 19,

2019 [Dkt No. _____] (the "**Motion**"), seeking approval of, among other things, bid

procedures, form and manner of notice of sale, auction protocols, expense reimbursements, and

Motschenbacher & Blattner, LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

**EXHIBIT C
Page 1 of 13**

final approval of sale to the Successful Bidder of substantially all of the assets of Debtor's business, including the Material Contracts to be assumed (collectively, the "**Purchased Assets**"), free and clear of Liens, Liabilities, claims, debts, interests or encumbrances (except for the Permitted Liens and Assumed Liabilities) in accordance with the Asset Purchase Agreement ("**Agreement**") with Juanita's Snacks, LLC ("**Buyer**").

      Having considered the written submissions, arguments of counsel and evidence presented at the Sale Hearing, together with the files and records in this case; and now being fully advised and after due deliberation, the Court FINDS as follows:

      A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. § 1408. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). To the extent required by law, each creditor and party in interest has acknowledged and consented to this Court's authority to enter this Sale Order as a final order of this Court, or all challenges to this Court's authority have been overruled or waived.

      B.      The statutory predicates for the sale and assignment of the Purchased Assets are Sections 105(a), 363 and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

      C.      Findings of fact herein shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact as appropriate.

      D.      Debtor and Buyer entered into the Agreement, dated as of August 14, 2019, pursuant to which Buyer agreed to purchase the Purchased Assets, subject to the conditions set forth in the Agreement.

      E.      As evidenced by the certificates of service filed with this Court [Dkt No. ____] and based on representations of the Debtor and their counsel at the Sale Hearing, good, proper,

ORDER APPROVING SALE FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES

Motschenbacher & Blattner, LLP
117 SW Taylor Street, Suite 300
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

**EXHIBIT C
Page 2 of 13**

timely, adequate and sufficient notice of the Motion, the Sale Procedures Order [Dkt No. ____],

the Notice of Sale Procedures, the Notice of Sale, and the Assumption and Assignment Notice,

and a reasonable opportunity to object, has been provided in compliance with Sections 102(1),

363(b), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008,

and 9014, the local rules of this Court, and any other applicable requirements. Debtor has served

the required notices on: (i) Buyer; (ii) the Creditors' Committee; (iii) the Secured Creditors; (iv)

all equity interests; (v) all other persons or entities holding or claiming to have liens or interests

in any of the Purchased Assets; (vi) the Office of the United States Trustee; (vii) all creditors of

the Debtor; (viii) the Internal Revenue Service, the Oregon Department of Revenue, and any

other entity to whom any tax or other charge may be due, or owing; (ix) all individuals or entities,

if any, which have contacted the Debtor to express interest in purchasing the Purchased Assets;

(x) all individuals or entities, if any, whom the Debtor believes might have an interest in

purchasing the Purchased Assets; (xi) all parties requesting special notice in this Chapter 11 case;

and (xii) all other persons or entities required to be served pursuant to orders of this Court, or

known counsel for any of the foregoing.

     F.     The procedural due process requirements of the United States Constitution were

satisfied by Debtor's service of the documents described in Section E, above. Service of each of

the foregoing was good, proper, timely, adequate and sufficient under the circumstances and no

other or further notice of the proposed sale of the Purchased Assets is or shall be required.

     G.     After the Debtor filed the Sale/Bid Procedures Motion, the Court entered the

Sale Procedures Order, and approved the Sale Notice, which the Debtor served as provided in

paragraph E above, the Debtor either received no competitive bids, or received no competing

ORDER APPROVING SALE FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES

Motschenbacher & Blattner, LLP
117 SW Taylor St., Suite 300
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

EXHIBIT C

bids conforming to the Sale Procedures Order and/or any competing bid that may have been

received was inferior to that submitted by Buyer, with the result that Buyer submitted the highest

and best bid, and is entitled to be the Successful Bidder as described in the Sale Procedures

Order.

H.      Prior to the Petition Date, the Debtor engaged in significant marketing efforts to

sell the Purchased Assets.  In accordance with the procedures described in the Sale Procedures

Order, the Debtor exposed the Purchased Assets to potential purchasers in the most effective

means available under the circumstances.  The Debtor has proven that its business could not

withstand a lengthier or more extensive marketing process, which would be costly and result in

undue delay, and any such process is not likely to produce a higher bid.

I.      The Debtor is the sole and lawful owner of the Purchased Assets and following the

closing of the sale of the Purchased Assets to Buyer, Buyer will be the sole and lawful owner of

the Purchased Assets. Debtor is authorized to sell the Purchased Assets free and clear of all

Liens, Liabilities, claims, debts, interests or encumbrances (except for the Permitted Liens and

Assumed Liabilities) because each entity, including the Secured Creditors holding liens or

security interests in the Purchased Assets to be transferred on the Closing Date either (i) has

consented to the sale; (ii) could be compelled in a legal or equitable proceeding to accept a money

satisfaction of such interest; or (iii) otherwise falls within the provisions of Section 363(f) of the

Bankruptcy Code, and therefore, in each case, one or more of the standards set forth in Section

363(f)(1)-(5) of the Bankruptcy Code has been satisfied.

J.      Any and all holders of Liens, Liabilities, claims, debts, interests or encumbrances

have received good, proper, and sufficient notice, and did not object to the sale pursuant to the

Motschenbacher & Blattner, LLP
117 SW Tay...
Portla...
Phone: (503) 417-0500
Fax: (...

**EXHIBIT C**
**Page 4 of 13**

Sale Procedures Order and the Sale Notice, and are deemed to have consented pursuant to Section 363(f) of the Bankruptcy Code. Moreover, the Secured Creditors have affirmatively consented to the sale, and therefore the sale complies with Section 363(f)(2).

K.     The Debtor has established and proved good and sufficient reasons for approval of the proposed sale under the terms of the Agreement. The Agreement previously was approved by this Court in Sale Procedures Order.

L.     The Debtor has also established and proved (i) good, sufficient, and sound business purpose and justification; (ii) the sale is in the best interest of the estate; and (iii) compelling circumstances for the sale other than in the ordinary course of business, pursuant to Section 363(b) of the Bankruptcy Code, in that, among other things, the immediate consummation of the sale to Buyer is necessary and appropriate to maximize the value of the estate; the sale will provide the means for Debtor to maximize distributions to creditors; and absent consummation of the sale, Debtor would be forced to surrender the assets to the Secured Creditors, or liquidate the assets in a piecemeal fashion, or convert this case to a case under Chapter 7, either of which would yield a lesser recovery for distribution to creditors than the sale pursuant to the Agreement with Buyer.

M.     The Agreement constitutes the highest or best offer for the Purchased Assets, is fair value, and constitutes reasonably equivalent and reasonable market value and fair consideration for the Purchased assets, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. The value of the Purchased Assets is maximized by a sale in one lot rather than in piecemeal sales. A sale of the Purchased Assets, other than free and clear as provided for in this Sale Order, would yield substantially less value

ORDER APPROVING SALE FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES

Motschenbacher & Blattner, LLP
117 SW Tay...
Portla...
Phone: (503) 417-0500
Fax: (...

EXHIBIT C
Page 5 of 13

for the Estate, with less certainty than provided by the sale of the Purchased Assets to Buyer. The Debtor's determination that the Agreement constitutes the highest or best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtor's business judgment.

N.     The Agreement was negotiated, proposed and entered into by the parties in good faith, from arm's-length bargaining positions and without collusion or fraud of any kind. No provision of the Agreement is in conflict with or violates this Sale Order. Buyer is not an "insider" or "affiliate" of the Debtor as those terms are defined in the Bankruptcy Code. Buyer is not a mere continuation of the Debtor or its estate and there is no continuity between Buyer and the Debtor. Buyer is not holding itself out to the public as a continuation of the Debtor. Buyer is not a successor to the Debtor or its estate and the purchase of the Assets does not amount to a consolidation, merger, or *de facto* merger of Buyer and the Debtor or the bankruptcy estate, or a continuation of the Debtor or the bankruptcy estate's business. The sale of the Assets to Buyer is not being undertaken for the purpose of escaping liability for the Debtor's debts.

O.     Neither Buyer nor the Debtor engaged in any conduct that would prevent the application of Section 363 of the Bankruptcy Code or cause the application of Section 363(n) of the Bankruptcy Code with respect to the consummation of the transaction approved under this Sale Order. Buyer is a good faith purchaser under Section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby with respect to the transactions contemplated by the Agreement, and the provisions of Section 363(n) of the Bankruptcy Code are not applicable. In the absence of a stay pending appeal, if the closing of the sale occurs at any time after entry of this Sale Order, then Buyer, as a purchaser in good faith of the Purchased

Page 6 of 13 -   ORDER APPROVING SALE FREE AND CLEAR OF
{00292543:1}          LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES

Motschenbacher & Blattner, LLP
117 SW Taylor St., Suite 300
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0522

EXHIBIT C
Page 6 of 13

Case 19-62049-tmr11     Doc 48     Filed 08/19/19

Assets, shall be entitled to all of the protections of Section 363(m) of the Bankruptcy Code if this Order or any authorization contained herein is reversed or modified on appeal.

P.     The Debtor has the power and authority to execute and deliver the Agreement, and all other documents contemplated thereby, and to consummate the transactions contemplated by the Agreement. The Agreement and all of the transactions contemplated thereby have been duly and validly authorized by all necessary actions of the Debtor. No consents or approvals other than authorization and approval of this Court are required for the Debtor to consummate the sale.

Q.     Buyer would not have entered into the Agreement and would not consummate the transaction contemplated thereby, thus adversely affecting the Debtor, the Estate, and its creditors, if the Court did not enter this Sale Order and provide Buyer with the protections hereunder.

R.     Time is of the essence in closing the sale of the Purchased Assets in accordance with the Agreement.

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1.     Debtor's Motion to finally approve sale to Buyer, contained in the Motion, but on which ruling was previously reserved until the Sale Hearing, is GRANTED in all respects.

2.     Any objections to entry of this Sale Order or to the relief granted herein and requested in the Motion that have not been withdrawn, waived, resolved, or settled, and all reservation of rights included therein are hereby denied and overruled on the merits with prejudice.

Motschenbacher & Blattner, LLP
117 SW Taylor [illegible]
Portla[illegible]
Phone: (503) 417-0500
Fax: [illegible]

**EXHIBIT C**
**Page 7 of 13**

3.      Pursuant to Sections 105 and 363 of the Bankruptcy Code, the Debtor is hereby authorized and directed to sell the Purchased Assets to Buyer in accordance with the terms of the Agreement, and is empowered and directed to fully perform under, consummate, and implement the Agreement, and to execute and deliver to Buyer all additional instruments and documents that may be reasonably necessary or desired by Buyer to implement the Agreement.

4.      Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets shall be sold, assigned, transferred, and conveyed to Buyer in accordance with the Agreement.  Such sale, assignment, transfer and conveyance shall, as of the Closing Date, constitute a legal, valid, binding and effective sale, assignment, transfer, and conveyance of all such Purchased Assets to Buyer, and shall, pursuant to Section 363(f) of the Bankruptcy Code, vest in Buyer full title in and to the Purchased Assets, as of the Closing Date, free and clear of any Liens, Liabilities, claims, debts, interests or encumbrances (except for the Permitted Liens and Assumed Liabilities) of any person or entity.  All holders of any such Liens, Liabilities, claims, debts, interests or encumbrances (except for the Permitted Liens and Assumed Liabilities) are forever barred, estopped, and permanently enjoined from asserting any Liens, Liabilities, claims, debts, interests or encumbrances (except for the Permitted Liens and Assumed Liabilities) in and to the Purchased Assets.

5.      The sale of the Purchased Assets to Buyer shall vest Buyer with all of the Debtor's right, title, and interest in and to the Purchased Assets and Buyer shall be the sole and exclusive owner thereof in accordance with the terms of this Sale Order and the Agreement.  As of the Closing, Buyer shall have any and all rights, claims, defenses, offsets, offsets, and recoupments held by the Debtor and the estate as to the Purchased Assets.

Motschenbacher & Blattner, LLP
117 SW Tay...
Portla...
Phone: (503) 417-0500
Fax: (5...

EXHIBIT C
Page 8 of 13

6. Each federal, state, and local filing office and each Governmental Authority are directed to accept, file, and record, any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

7. All Liens, Liabilities, claims, debts, interests or encumbrances (except for the Permitted Liens and Assumed Liabilities) shall attach to the proceeds from the sale of the Purchased Assets to the same extent, priority, and validity as they attached to the Purchased Assets on the Petition Date, subject to any rights, claims, and defenses the Debtor may possess with respect thereto.

8. Except as expressly set forth in this Sale Order, and in Section 1.4 of the Agreement, Buyer is not assuming or becoming obligated to pay, and the Purchased Assets shall not be or become liable for or subject to, any liabilities of or to the Debtor's employees, including any liabilities related to employment practices, COBRA, equal employment opportunity, nondiscrimination, harassment, wrongful termination, breach of contract, immigration, wage and hour laws, any other state, federal or local labor and employment laws, liability under the WARN Act, salaries, vacations, sick pay, incentives, severance pay, bonus, overtime, meal period, pension profit sharing retirement and/or deferred compensation and any other compensation or benefits, which claims, if any shall be and remain the liability of the Debtor.

9. The sale, assignment, transfer and conveyance of the Purchased Assets pursuant to this Sale Order shall not subject Buyer to any liability with respect to the obligations incurred in connection with, or in any way related to, Debtor or the Purchased Assets prior to the Closing Date, and except with respect to the Permitted Liens and Assumed Liabilities Buyer is released from any potential liability with respect to any of the Purchased Assets. All persons who have

ORDER APPROVING SALE FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES

Motschenbacher & Blattner, LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

**EXHIBIT C**
**Page 9 of 13**

received the notices described in Section E, above, are bound by this Order and are enjoined from pursuing Buyer to recover on any claims they may have against Debtor

10.     The transactions contemplated by the Agreement are undertaken by the Debtor and Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code. Buyer is not an "insider" or "affiliate" of the Debtor as those terms are defined in the Bankruptcy Code. Neither Buyer nor the Debtor engaged in any conduct that would prevent the application of Section 363 of the Bankruptcy Code with respect to the consummation of the transaction approved under this Sale Order. As a good faith purchaser under Section 363(m) of the Bankruptcy Code, Buyer is entitled to all of the protections afforded thereby with respect to the transactions contemplated by the Agreement, and the provisions of Section 363(n) of the Bankruptcy Code are not applicable. The consideration provided by Buyer for the Purchased Assets under the Agreement is the product of non-collusive, arm's-length negotiations, and is fair and reasonable and may not be avoided under the provisions of Section 363(n) of the Bankruptcy Code. Reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the sale to Buyer or the applicability of Section 363(m) of the Bankruptcy Code.

11.     Neither Buyer nor any person or entity acting on its behalf has become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by the Agreement.

12.     Any holder of a Liens, Liabilities, claims, debts, interests or encumbrances (other than a Permitted Lien) in any of the Purchased Assets is provided adequate protection within the meaning of Section 363(e) of the Bankruptcy Code, by the terms of this Sale Order, including but

Motschenbacher & Blattner, LLP
117 SW ...
Po...
Phone: (503) 417-0500
Fax: ...

EXHIBIT C
Page 10 of 13

not limited to the provisions of this Sale Order that provide for the proceeds of the sale to attach to such Liens, Liabilities, claims, debts, interests or encumbrances.

13.     Effective (a) upon payment by the Debtor of the Cure Costs; and (b) on the Closing Date, each Material Contract shall be deemed assumed by the Debtor and assigned to Buyer. The Debtor is ordered to pay the Cure Costs in the manner and within the time set forth in Section 1.5 of the Agreement. The requirements of Sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are satisfied with respect to the Material Agreements, and except as expressly assumed at the closing of the purchase of the Purchased Assets, all executory contracts and unexpired leases are hereby rejected. Any counterparty to a Material Agreement proposed to be assumed and assigned that did not timely file and serve an objection to the assumption and assignment as required by the Assumption and Assignment Notice is deemed to have consented to the assumption and assignment of its Material Agreement to Buyer and the cure of existing defaults and is forever barred from objecting to the cure and from asserting any additional cure or other amounts against the Debtor or Buyer.

14.     On or before the Closing Date, each of the Debtor's creditors is directed to execute such documents and take all other actions as may be necessary, or reasonably requested by the Debtor or Buyer to release its Liens, Liabilities, claims, debts, interests or encumbrances in the Purchased Assets, if any, as such Liens, Liabilities, claims, debts, interests or encumbrances may have been recorded or otherwise exist. The Debtor is directed to turn over to Buyer physical possession of all of the Purchased Assets and to cooperate with Buyer in transferring the Purchased Assets to Buyer, including without limitation executing and delivering such documents as may be necessary to transfer the Intellectual Property to Buyer. The Debtor is

Page 11 of 13 -   ORDER APPROVING SALE FREE AND CLEAR OF
{00292543:1}          LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES

Motschenbacher & Blattner, LLP
117 SW ... ... ...
Po... ...
Phone: (503) 417-0500
Fax: ... ... 0...

**EXHIBIT C**
**Page 11 of 13**

further directed to cooperate with Buyer in calculating the amount of the Purchase Price

Adjustments as required in Section 2.2 of the Agreement, to obtain and deliver to Buyer the

Estoppel Certificates, and to otherwise fully comply with its obligations under the Agreement.

15.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in

any way to the transfer of the Assets to Buyer.

16.     This Sale Order shall be effective and enforceable immediately upon entry and,

notwithstanding the provisions of Bankruptcy Rules 6004 or 6006, this Sale Order shall not be

stayed after the entry hereof, but shall be effective and enforceable immediately upon issuance

hereof.  Time is of the essence in closing the transactions referenced herein, and the Debtor and

Buyer are authorized close the sale immediately upon entry of this order, or as soon as practicable

thereafter.

17.     This Court retains jurisdiction to enforce and implement the terms and provisions

of the Agreement, all amendments thereto, any waivers and consents thereunder and each of the

agreements executed in connection therewith.  To the extent that this Sale Order is inconsistent

with any prior order or pleading with respect to the Sale Procedures Order, the terms of this Sale

Order shall govern.  The provisions of the Agreement and this Sale Order shall remain effective

and enforceable notwithstanding the appointment of a trustee or subsequent entry of any order

confirming any Chapter 11 plan or other order in this case (including any order entered after any

conversion of this case under Chapter 7 of the Bankruptcy Code).

# # #

CERTIFICATION OF COMPLIANCE WITH LBR 9021-1(a)(2)(A)

I certify that I have complied with the requirements of LBR 9021-1(a)(2)(A).

ORDER APPROVING SALE FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES



Motschenbacher & Blattner, LLP
117 SW
Po
Phone: (503) 417-0500
Fax

PRESENTED BY:

LEONARD LAW GROUP LLC

    __[unsigned proposed version]
Timothy A. Solomon, OSB 072573
Justin D. Leonard, OSB 033736
Holly C. Hayman, OSB 114146
Proposed Counsel to Debtor and Debtor in Possession

c:      ECF Participants

ORDER APPROVING SALE FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES

Motschenbacher & Blattner, LLP
117 SW Taylor Street, Suite 300
Portland, Oregon 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

**EXHIBIT C**
**Page 13 of 13**

## CERTIFICATE OF SERVICE

I certify that on the undersigned date, I have caused this **MOTION FOR ORDERS AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR AND RELATED RELIEF** to be served on interested parties requesting notice through the Court's CM/ECF system, as well as by first class U.S. mail on the following parties:

U.S. Department of Justice
Office of the United States Trustee
405 E. 8th Avenue, Suite 1100
Eugene, OR 97401-2706

Personnel Source, Inc.
Attn: Jerry Stiltner
555 Lincoln St
Eugene, OR 97401

Columbia Corrugated Box
Attn: Mark Overholt
12777 SW Tualatin Sherwood Rd.
Tualatin, OR 97062

Columbia State Bank
Attn: Hadley S. Robbins, CEO
1301 A St. Suite 800
Tacoma, WA 98402

Celtic Capital Corp.
Attn: Mark Hafner, President
23622 Calabasas Rd. Suite 323
Calabasas, CA 91302

Dominguez Family Enterprises, Inc.
Attn: Ruben Cleaveland, Reg. Agent
417 Sherman Avenue, Suite 7
Hood River, OR 97031

American Pop Corn Company
Attn: Garry Smith, President
One Fun Place
PO Box 178
Sioux City, IA 51108

Frank and Linda Taylor
95796 Howard Lane
Junction City, OR 97448

CDB Packaging, Inc.
c/o Carl D. Brunst, Reg. Agent
2058 N. Mills Ave. #246
Claremont, CA 91711

Graystone Legacy Investments, Inc.
c/o Grant Jones, CEO
18301 NE 78th Cir.
Vancouver, WA 98682

OnDeck Capital
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

2Loris, LLC
c/o Randy McPherson, Registered Agent
1247 Crenshaw Rd.
Eugene, OR 97401

Lane County
c/o Stephen E. Dingle, county counsel
125 E. 8th Avenue
Eugene, OR 97401

Lane County
c/o Stacie Smith, Accounting Manager
125 E. 8th Avenue
Eugene, OR 97401

DATED: August 19, 2019

By: /s/ Timothy A. Solomon
Timothy A. Solomon, OSB 072573

**Page 1 - CERTIFICATE OF SERVICE**

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97204
www.leonard-law.com